OPINION
BUSH, Judge.
This contract dispute is currently before the court on defendant’s Motion For Summary Judgment and plaintiffs Cross-Motion For Summary Judgment. For the reasons set forth herein, defendant’s Motion For Summary Judgment is hereby granted and plaintiffs Cross-Motion for Summary Judgment is accordingly denied.
BACKGROUND
I. Factual Background
The parties have filed joint stipulations of fact and accordingly, the following facts are undisputed, unless otherwise indicated. Plaintiff, Conner Brothers Construction Company, Inc. (Conner), is an Alabama corporation. On June 28, 1996, the United States Army Corps of Engineers, Savannah *660 District (Corps or Army), awarded contract no. DACA21-96-C-0059, Hospital Life Safety Upgrade (contract) to Conner for duct-work to be done at Martin Army Community Hospital (Hospital). The original amount for this firm, fixed-priced contract was $4,663,187. The original duration of the contract was 720 days. With options and modifications, the contract amount increased to $7,749,576 and the contract duration was extended to 772 days.
The Hospital is located at Fort Benning, Georgia, and was constructed in 1958, with an adjacent warehouse and a two-story outpatient clinic constructed in 1977, and exteri- or stair towers constructed in 1978. In 1992, the Corps sought to renovate the Hospital, in part, to address potential Life Safety Code concerns. The most serious deficiencies were in corridor wall protection. Those deficiencies included lack of effective smoke partitions for compartmentalization of fire zones, inadequate protection of hazardous areas, lack of exit capacity on patient sleeproom floors, and a fire alarm system which was inaudible from the outpatient clinic. The Corps sought to correct the Life Safety Code deficiencies by, among other things, replacing existing doors and frames to ceiling corridors and other partitions from floor levels to the structure above in order to achieve the necessary fire rating; providing a protected path to exits; adding fire alarm pull boxes at strategic locations; replacing plain glass at view windows and door vision panels with required wire glass; and removing and replacing asbestos-containing materials.
Most of the ceilings in the Hospital were of a locked-in-place, concealed spline design. In some areas of the Hospital, the ceilings were constructed of plaster. During the solicitation of the contract, and prior to the submission of bids, the Corps amended its solicitation by issuing Bid Amendment 0002, dated May 15, 1996, which advised bidders, in relevant part, that they would be responsible for the demolition of the old, existing Hospital ceilings and the reinstallation of new ceilings throughout the Hospital while the Hospital remained an occupied and functioning medical facility.[1]
The contract called for the successful bidder to install a new sprinkler system and replace existing 1' x 1' and 2' x 4' ceiling tile systems with a new 2' x 2' lay-in ceiling tile system. Included in the replacement work was the replacement of existing grilles, diffusers, and light fixtures, as indicated in the contract specifications and drawings.[2]
A diffuser is a circular, square or rectangular air distribution outlet, generally located in the ceiling, and comprised of deflecting members to discharge supply air in various directions. A grille is a louvered or perforated panel used to cover an air duct opening in a wall, ceiling or floor. Diffusers and grilles are mechanical instruments regulating air *661 flow. On the Life Safety Upgrade project at the Hospital, the diffusers in question were all located in the ceiling and were used for heating, ventilation and air-conditioning (HVAC) supply air. The grilles were also located in the ceiling but were used for HVAC return air.
The diffusers and grilles at the Hospital varied in size and shape in accordance with the design air flow. The contract drawings showed that the new diffusers and grilles were intended to have the same air flow as the old diffusers and grilles, as indicated in contract drawing, Plate M-8, sheet 77, listing the neck sizes at the interface between the existing ductwork and the diffusers and grilles. The contract also specified that “[djiffuser types shall be as indicated ---- Duct collar connecting the duct to diffuser shall be airtight and shall not interfere with volume controller. Return or exhaust units shall be similar to supply diffusers.” Def.’s App. at 54.[3] “Flexible Duct runouts shall be used only where indicated. Runouts shall not exceed 10 feet in length, shall be preinsu-lated, factory fabricated, and shall comply with” the applicable life safety codes. Def.’s App. at 165-66.[4]
The contract also contained the following clauses: (1) Federal Acquisition Regulation (FAR) 52.243-4, Changes, see 48 C.F.R. § 52.243-4 (1987) (hereinafter changes clause); (2) FAR 252.236-7001, Contract Drawings, Maps and Specifications, see 48 C.F.R. § 252.236-7001 (1991) (hereinafter omissions clause); (3) FAR 52.236-2, Differing Site Conditions, see 48 C.F.R. § 52.236-2 (1987) (differing site conditions clause); (4) FAR 52.236-3, Site Investigation and Conditions Affecting the Work, see 48 C.F.R. § 52.236-3 (1984) (hereinafter site investigation clause); and (5) FAR 52.236-27, Site Visit (Construction), see 48 C.F.R. § 52.236-27 (1995) (hereinafter site visit clause).
Mr. Donald Conner, president of Conner, made three pre-bid site visits to the project site.[5] On June 20, 1996, Conner submitted its bid on the contract in the base amount of $4,663,187. Conner’s bid included options, which, if exercised by the Corps, would result in a total contract price of $7,270,637. According to the parties, Mr. Turner bid the mechanical work for the Hospital project based upon reconnecting the new grilles and diffusers to the ductwork by means of a “collar.” A collar is a piece of metal that connects to the grille and connects to the existing duct.
Two additional bidders responded to the government’s solicitation: (1) Wright Associates, Inc.’s bid of $8,290,500; and (2) Wither-ington Construction Corporation’s bid of $9,070,297. The Corps’ estimate for the project was $8,045,869. Conner’s low bid was 90.3% of the Corps’ estimate, and did not provide a separate estimate for the contemplated mechanical work. Prior to award, the government saw no need for bid verification and did not request that Conner verify its bid. The contract was awarded to Conner on June 28,1996.
During performance of the contract, Conner’s mechanical subcontractor, Phenix, raised the issue of extra compensation for reconnecting the new diffusers and grilles to the Hospital’s existing HVAC system. The precise date that this occurred remains an immaterial dispute between the parties. Conner alleges that the issue was raised on February 11, 1997, while the Corps contends that this issue was first raised on February 14, 1997. During performance of the contract, Phenix found that the existing ducts were “hard piped” to the diffusers and grilles and that the existing HVAC duct system was located too low, or tight, to the new ceiling to permit the re-installation of hard duct-work. *662 The new diffusers specified and provided for the new 2' x 2' ceiling system were incompatible with the existing duct configuration. It became apparent that removal of existing sections of ductwork would be necessary, resulting in additional costs. Phenix requested that Conner execute a change order and it provided Conner with a cost estimate for its suggested recommendations for reconnecting the new diffusers and grilles. In turn, Conner raised the issue of extra compensation for reconnecting the new diffusers and grilles with the Corps on March 4, 1997 during the weekly coordination meeting held between Conner and the Corps.
Between March 1997 and September 1997, the parties held at least one meeting and exchanged other correspondence regarding this issue. The substance of the meeting and correspondence is in dispute. Conner alleges that during the meeting, the Corps advised Conner that “the connection between the new diffuser and the existing duct are considered to be part of subject contract and a modification shall not be forthcoming for this portion of work.” Pl.’s Findings of Fact 11152. Conner alleges that the Corps acknowledged that reconnection of the grilles and diffusers was additional work under the contract and that the meeting and correspondence represented an attempt to negotiate a price. The Corps maintains that, at this meeting, Conner merely raised the issue of extra compensation for reconnecting the diffusers and grilles. The Corps’ position throughout these discussions, however, was that Conner was not entitled to an upward adjustment to the contract price because the alleged “extra-work” was simply required work by the contract as awarded.
On October 17, 1997, the Corps advised Conner that if it desired to submit a claim pursuant to the contract, Conner should certify its claim. On November 7,1997, Conner provided its certified claim to the Corps in the amount of $245,954 on behalf of Phenix for alleged increased costs related to - the installation of replacement diffusers and grilles in the Hospital’s HVAC system.
On January 21, 1998, the contracting officer forwarded a letter to Conner indicating her intent to deny the claim and offered Conner the opportunity to present any further matters relating to the diffuser and grille issue. As a result, a meeting was held between the contracting officer and Conner on August 11, 1998, in which Conner again stated its position that it was entitled to an upward adjustment of the contract price. On September 1, 1998, the contracting officer issued her final decision, finding no merit in Conner’s claim and denying the claim in its entirety. The contracting officer concluded that the reconnection of new diffusers and grilles was manifestly necessary to perform the contract as awarded and that any difficulties Conner or Phenix encountered during performance were discoverable by Conner, or its subcontractor, upon their review of the contract and during a reasonable pre-bid site inspection.
On September 4, 1998, Conner received the contracting officer’s final decision via certified mail. Conner filed its complaint in this court on August 26, 1999, seeking review of the contracting officer’s final decision pursuant to the Contract Disputes Act of 1978(CDA), 41 U.S.C. § 601, et seq (2000).
II. Procedural History
This action is an appeal from the contracting officer’s final decision denying Conner’s claim for additional compensation for air duct modifications. Conner received a copy of the contracting officer’s September 1, 1998 Final Decision on September 4, 1998 and filed its complaint, on behalf of its mechanical subcontractor, Phenix, on August 26, 1999. Conner seeks a review of the contracting officer’s final decision pursuant to the CDA.
Conner claims that the government is responsible for $245,954 in costs which were allegedly incurred by Phenix during performance of the contract. Conner alleges that during performance of the contract, Phenix encountered conditions in above-ceiling space that were different from those represented in the contract specifications and drawings. Specifically, Conner alleges that during the demolition and installation of ceilings in the Hospital, and during removal and replacement of HVAC diffusers and grilles (referred to by the parties as “D & Gs”), Phenix performed work not contemplated by the *663 contract when it had to reconnect the new diffusers and grilles to the existing HVAC system. Conner argues that this work was not part of the contract, as awarded by the Corps and, therefore, amounted to extra work for which it is entitled to recover an upward adjustment to the contract price. Conner further alleges that the extensive demolition and removal of existing ductwork running out to the diffusers and grilles was uncontemplated, also requiring an equitable adjustment of the contract price. Conner alleges that it is entitled to payment for the work in the amount of $245,954.
Conner alleges seven causes of action relating to the D & G reinstallation costs. Specifically, Conner alleges: (1) that the government breached the contract by failing to pay for the additional work conducted; (2) that the government changed the contract under the changes clause by requiring Conner to perform the added work; (3) that the contract specifications and drawings were defective for failing to show the need to demolish existing ductwork or to provide a design for the fabrication and installation of the new ductwork; (4) that the government had superior knowledge concerning the need for the demolition of the existing ductwork, as well as the design, fabrication and installation of the new ductwork; (5) that it was impossible for Conner to complete the work as provided in contract specifications and drawings without a design modification; (6) that the government is estopped from asserting that the work was not changed; and (7) that the government failed to call to Conner’s attention a potential mistake in the bid related to the D & G work.
On September 10, 2002, the government filed its Motion for Summary Judgment, arguing that the plain terms of the contract unambiguously required Conner to replace the existing diffusers and grilles with new diffusers and grilles. The government argues that the ordinary meaning of the contract terms required Conner to install the new diffusers and grilles into the existing HVAC system. Accordingly, defendant argues, Conner cannot demonstrate that it is entitled to an upward adjustment of the contract. The government farther contends that despite Conner’s claimed discovery of additional above-ceiling work during performance, all of the work necessary to replace and install the diffusers and grilles was required under the contract.
On October 11, 2002, plaintiff filed its Response to Defendant’s Motion for Summary Judgment, and at the same time, its Cross-Motion for Summary Judgment. With respect to defendant’s Motion for Summary Judgment, plaintiff argues that the government misunderstands Conner’s claim as simply relating to the reconnection of the diffusers and grilles. Conner contends that the issue, instead, is whether the extensive demolition and removal of the existing duct-work running out to the diffuseis and grilles was also required under the contract. With respect to plaintiffs Cross-Motion for Summary Judgment, plaintiff argues that the facts and law support entry of summary judgment in its favor.[6]
DISCUSSION
I. Standard of Review
The parties have filed cross-motions for summary judgment on the complaint under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” RCFC 56(c). A genuine issue of material fact is one that would change the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
In the capacity of opposing the moving party’s motion, the non-moving party has the burden of providing sufficient evidence to show that a genuine issue of material fact *664 indeed exists. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it will make a difference in the result of a ease under the governing law. See Anderson, All U.S. at 247-48, 106 S.Ct. 2505. Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. Id. at 255, 106 S.Ct. 2505. Summary judgment pursuant to RCFC 56 can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. Pure Gold, Inc. v. Syntex (U.S.A.), Inc., 739 F.2d 624, 626 (Fed.Cir.1984). When reaching a summary judgment determination, the judge’s function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. Anderson, All U.S. at 249, 106 S.Ct. 2505. If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied.
The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmov-ing party’s case. Celotex, All U.S. at 325, 106 S.Ct. 2548.
The court addresses the issues and burdens surrounding pending cross-motions for summary judgment. Separate motions for summary judgment from each party are not an admission that no material facts remain at issue. See Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed.Cir.1997) (citing United States v. Fred A. Arnold, Inc., 573 F.2d 605, 606 (9th Cir.1978)). As in this case, “separate summary judgment motions of each party may focus on different legal principles and posit as undisputed different sets of facts.” Id. (on cross-motions for summary judgment, stating that “[ejach party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts”); see also Bayou Land & Marine Contractors, Inc. v. United States, 23 Cl.Ct. 764, 768 (1991) (“Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law.”) (citing Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548). Just as plaintiff has the burden of setting forth evidence showing that a genuine issue of material fact exists in opposing defendant’s motion for summary judgment, as the nonmovant with respect to plaintiffs motion for summary judgment, defendant has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. Bayou Land, 23 Cl.Ct. at 768 (citing Celotex, 477 U.S. at 322, 106 S.Ct. 2548). The court must evaluate each party’s motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed.Cir.2001).
The court addresses both parties’ motions for summary judgment simultaneously as to each issue raised. Defendant requests that this court rule in favor of its motion for summary judgment on the basis that the material facts in this matter are not in dispute. Defendant contends that the court should interpret the contract and rule that as a matter of law, Conner cannot establish a claim for an equitable adjustment. Plaintiff argues that because the contract incorporated a standard changes clause, the contracting officer is required to make an equitable adjustment and modify the contract.
II. Analysis
A. Jurisdictional Threshold
Contract disputes in which the government is a party are resolved under the CDA. The CDA authorizes a contractor to bring an action directly on a claim in this court or to file an appeal with the agency board of contract appeals. 41 U.S.C. §§ 606, 609(a). The CDA requires that a contractor submit its claim to the contracting officer prior to commencing suit. Id. § 605(a). In this instance, Conner submitted a certified claim to *665 the contracting officer on November 7, 1997. The contracting officer issued a final decision denying Conner’s claim on September 1, 1998. This denial grants the court jurisdiction to hear this lawsuit. See Overall Roofing & Constr., Inc. v. United States, 929 F.2d 687, 689 (Fed.Cir.1991). The CDA provides that a contracting officer’s final decision must be in writing and must be mailed or otherwise furnished to the contractor. 41 U.S.C. § 605(a). A claim was properly submitted to the contracting officer and Conner received a copy of the contracting officer’s September 1, 1998 final decision on September 4, 1998. Conner’s instigation of this lawsuit on August 26, 1999 also satisfies the one-year statute of limitations within which a party can commence a lawsuit once a contracting officer has denied a contractor’s claim. 41 U.S.C. § 609(a)(3).
It is important to note that findings of fact made by the contracting officer are neither binding upon the court, nor are they evidence. Wilner v. United States, 24 F.3d 1397, 1401 (Fed.Cir.1994). This court engages in a de novo review of the claim. 41 U.S.C. § 609(a)(3). Thus, having addressed the jurisdictional issues that pertain to this matter, the court turns to the substantive issues raised in the parties’ cross-motions for summary judgment.
B. Standard of Contract Interpretation
Issues of contract interpretation, such as the issues presented by the parties in the matter at hand, raise questions of law that are uniquely appropriate for summary judgment. See Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed.Cir. 2002); Mays v. United States Postal Service, 995 F.2d 1056, 1059 (Fed.Cir.1993) (citing Greco v. Dep’t of the Army, 852 F.2d 558, 560 (Fed.Cir.1988)). Interpretation of a contract, including a contract’s specifications and drawings, is a matter to be resolved by the court. P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed.Cir. 1984).
Contract interpretation begins with the plain language of the contract. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed.Cir.1991) (citation omitted). In interpreting the language of a contract, its terms must be accorded their plain and ordinary meaning. Harris v. Dep’t of Veterans Affairs, 142 F.3d 1463, 1467 (Fed.Cir.1998). If the language of the contract is unambiguous, the court must accept its plain meaning. Triax Pacific, Inc. v. West, 130 F.3d 1469, 1473 (Fed.Cir.1997). A contract term is unambiguous when there is only one reasonable interpretation. Bristol-Myers Squibb Co. v. United States, 48 Fed.Cl. 350, 355 (2000) (citations omitted). When the contract language is unambiguous, the court’s inquiry is at an end, and the plain language of the contract is controlling. Id. The mere fact that the parties may disagree with regard to the interpretation of a specific provision does not, in and of itself, render that provision ambiguous. See Cmty. Heeding & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed.Cir. 1993); Brunswick Corp. v. United States, 951 F.2d 334, 337 (Fed.Cir.1991) (citation omitted).
If, however, an ambiguity arises when interpreting a contractual provision, the proper interpretation is the reasonable and internally consistent one. See Brunswick Corp., 951 F.2d at 337. A contract is ambiguous where there are two reasonable interpretations that are consistent with the contract language. Community Heating, 987 F.2d at 1579 (citations omitted). The joint intent of the parties, if ascertainable, is decisive. See Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed.Cir. 1986). “‘It is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises.’ ” Id. (quoting United States v. Cross, 477 F.2d 317, 318 (10th Cir.1973)); see also Highway Prods., Inc. v. United States, 208 Ct.Cl. 926, 530 F.2d 911, 917 (1976) (‘Where there is an ambiguity in the contract instrument, it is appropriate to go outside the formal documents and ascertain the intent of the parties.”). If an ambiguity exists and extrinsic evidence does not establish clearly the parties’ intent, the ambiguity is construed against the drafter of the language under the doctrine of contra proferentem. *666 See Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc., 105 F.3d 629, 634 (Fed.Cir. 1997) (citing Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 398 (Del.1996)).
An ambiguity may be either patent or latent. A patent ambiguity is considered so obvious as to raise the duty to inquire, whereas a latent ambiguity is not glaring or substantial. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997 (Fed.Cir.1996); see also Hills Materials Co. v. Rice, 982 F.2d 514, 516 (Fed.Cir.1992). A contractor will be held responsible for “patent indications plainly, to a layman, contradicting the contract documents.” Stock & Grove, Inc. v. United States, 204 Ct.Cl. 103, 493 F.2d 629, 631 (1974). “If a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid.” Newsom v. United States, 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982); see also Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed.Cir.2004) (“The court will consider whether the ambiguity or lack of clarity was sufficiently apparent that there arose an obligation on the contractor to inquire as to that provision before entering into the contract.”) (citations omitted); M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1207 (Fed.Cir.2004) (finding that an inconsistency between contract drawings and specifications gave rise to a patent ambiguity, triggering contractor’s duty to inquire prior to the submission of its bid). In examining the legal import of a patent ambiguity, first the court asks whether the ambiguity was indeed patent — an obvious one. See SIPCO Servs. & Marine Inc. v. United States, 41 Fed.Cl. 196, 216 (1998). In this regard, the court asks whether the ambiguity is so glaring as to raise a duty to inquire. Id. (citing Newsom, 676 F.2d at 650); see also Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 413-14 (Fed. Cir.1988). If the ambiguity was not patent, the court then asks whether the plaintiffs interpretation of the contract was reasonable. SIPCO Services, 41 Fed.Cl. at 216 (citing Newsom, 676 F.2d at 650). In other words, the reasonableness of the contractor’s interpretation is irrelevant if the ambiguity is deemed patent. Id.
Keeping in mind the above-stated principles, the court must discern the scope of work under the operable language of the contract and whether there exists any ambiguity under the terms of the contract requirements. In order to conduct this analysis, the court will rely, for the most part, on the relationship of the parties established in writing. The court will examine the relevant contract documents which contain the parties’ respective obligations. See SIPCO Services, 41 Fed.Cl. at 213. The provisions of these documents will be interpreted in conformity with above-cited contract principles.
The government argues that the terms of the contract unambiguously required Conner to replace the existing diffusers and grilles and connect the new ones to the HVAC system. In that regard, the government argues that any additional expenditure made by Conner to successfully connect the new diffusers and grilles to the HVAC system should be borne by plaintiff. Conner, on the other hand, does not deny that it was required to replace and install the new diffusers and grilles. It agrees that this was a required task under the contract. However, Conner proclaims that it was required to undertake extensive demolition of the existing ductwork in order to remove the old diffusers and grilles and connect the new diffusers and grilles to the HVAC system. In that regard, Conner claims that the schedule of neck sizes shown in the contract drawings was not compatible with existing ductwork and, thus, instead of joining new diffusers and grilles to the existing ductwork by means of a duct collar, it was necessary to remove the existing duct and reroute it, requiring demolition of several feet of existing duct, and the installation of new ductwork and new transitions for the diffusers. Conner claims that it is entitled to an equitable adjustment to the contract to compensate it for this extra work.
C. Contract Language
The court turns to the operable contract language. There are a number of clauses that are applicable to this matter. The first of these is the site visit clause contained in *667 the Corps’ original solicitation for bids. This clause states:
The clauses at 52.236-2, Differing Site Conditions, and 52.236-3, Site Investigation and Conditions Affecting the Work, will be included in any contract awarded as a result of this solicitation. Accordingly, offerors or quoters are urged and expected to inspect the site where the work will be performed.
Site visits may be arranged during normal duty hours by contacting----
FAR 52.236-27.
Second, the parties stipulate that the contract contained the site investigation clause, which states that:
(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost ____ The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site ... as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.
(b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based upon the information made available by the Government.
FAR 52.236-3.
Third, the contract contained a clause regarding the omissions and misdescriptions of drawings and specifications of the work. The omissions clause states that:
(d) Omissions from the drawings or specifications or the misdescription of details or work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdes-cribed details of the work, but shall be performed as if fully and correctly set forth and described in the drawings and specifications.
FAR 252.236-7001(d).
Fourth, the parties stipulate that the contract contained the differing site conditions clause, which states that:
(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor’s cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.
(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.
(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.
FAR 52.236-2.
Fifth, the contract also contained the changes clause, which states that:
*668 (d) If any change under this clause causes ' an increase or decrease in the Contractor’s cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.
FAR 52.243-4. It is under this clause that plaintiff claims entitlement to an equitable adjustment.
In addition to these standard contracting clauses, the contract also specified the required work to be done by the successful bidder. The contract required Conner to the replace the 1' x 1' concealed spline ceiling system and the 2' x 4' existing ceilings with a new 2' x 2' lay-in ceiling tile system. In conjunction with the ceiling replacement by another Conner subcontractor, Phenix had to replace the diffusers and grilles. This requirement was incorporated into the contract through Bid Amendment No. 0002, dated May 16, 1996. The original contract language required the contractor to “verify all supply and return grilles.” Def.’s App. at 53. However, Amendment 0002 deleted this language, and required Conner, in relevant part, to:
Remove all 1' X 1' and 2' X 4' ceiling tiles and replace with new 2' X 2' ceiling tiles. Remove and replace 2' X 2' ceiling tiles as necessary for sprinkler, medical gas and duct installations and/or renovation.
Supply air diffusers and return air grilles in all 1' X 1' and 2' X 4' ceiling grids are to be removed and replaced with new diffusers and grilles. Remove and provide new diffusers and grilles in plaster ceilings where work is being performed above ceilings. See mechanical plate M-8 for schedule. Remove and reinstall diffusers and grilles in 2' X 2' ceiling grids where work is being performed above ceilings. Balance new air terminals.
Def.’s App. at 5.
Plaintiff claims that the Corps breached the contract when the government ordered Conner to perform changed or added work, and when a formal change order for the additional claimed work was never issued. However, in reviewing the aforementioned clauses, the court finds that Conner is not entitled to an equitable adjustment for additional costs incurred in connecting the new diffusers and grilles.
The standard changes clause at the basis of this dispute, as set forth in the FAR, authorizes the contracting officer to pay additional funds to contractors in the form of an equitable adjustment. See FAR 52.243-4(d). The spirit and purpose of an equitable adjustment, such as that sought by plaintiff here, is to benefit the contractor and make it whole for changes ordered by the government. See N. Am. Constr. Corp. v. United States, 56 Fed.Cl. 73, 78-79 (2003) (citing Bruce Constr. Corp. v. United States, 163 Ct.Cl. 97, 324 F.2d 516, 518 (1963) (“Equitable adjustments ... are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract.”)). “Generally, this provision is the sole contractual clause authorizing additional payments in the event of changes to a contract.” Id. at 79. The changes clause gives the government the unilateral right to order changes in work within the scope of the contract. Thermocor, Inc. v. United States, 35 Fed.Cl. 480, 492 (1996). The changes clause provides for an equitable adjustment if the change increases or decreases the cost or time of performance. Id.
In order for this court to accurately ascertain whether the ductwork claimed by Conner triggered the changes clause, the court must first determine the scope of the work required under the contract. In doing this, the court not only looks to the bidding documents, but also at the materials cited in the bidding documents. McCormick Constr. Co. v. United States, 18 Cl.Ct. 259, 263 (1989), aff'd, 907 F.2d 159 (Fed.Cir.1990). In looking at the relevant provisions at issue here, it is clear that the government cannot be held responsible for Conner’s extra expenses in completing the task it was required to perform from the outset under the contract. In the final analysis, the court agrees with defendant’s assertion that Conner ignores the plain language of the contract, which unambiguously required the successful bidder to *669 reconnect the newly installed diffusers and grilles to the existing HVAC system. Conner entered into a firm, fixed-price contract with the Corps and that contract unambiguously required Conner to remove and install HVAC diffusers and grilles throughout the Hospital. The contract required Conner to reconnect the diffusers and grilles to make them an operational component of the HVAC system. The additional tasks performed by Conner were simply work required to be performed by the successful bidder to accomplish this task.
D. Conner’s Site Visit and Inspection of the Work Area
The court comes to this conclusion first, with a review of the site visit clause. The site visit clause states that “offerors or quo-ters are urged and expected to inspect the site where the work will be performed.” FAR 52.236-27. Additionally, the site investigation clause required Conner to acknowledge “that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost ----” FAR 52.236-3. It also required Conner to acknowledge “that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site ... as well as from the drawings and specifications made a part of this contract.” Id. The site investigation clause released the government from liability, stating that “[a]ny failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.” Id. Lastly, “the Government assumes no responsibility for any conclusions or interpretations made by the Contractor based upon the information available.” Id.
Defendant argues that “Conner and its potential subcontractors were not precluded from investigating conditions above the ceiling which may have impacted their assessment of the difficulty in the removal and replacement of diffusers and grilles.” Def.’s Findings of Fact 1120. In addition, defendant claims that Conner’s pre-bid visits were not just limited to above-ceiling inspections. Id. In other words, defendant’s stance is that Conner had ample opportunity to make prebid inspections of the work site and that an “investigation of the ceiling areas should have revealed that the diffusers and grilles to be replaced were connected to the main horizontal ductwork with fabricated ‘hard’ duct-work rather than flexible duct, which was not in use at the time the building was originally constructed.” Id. ¶ 21.
Conner, on the other hand, maintains that it conducted a reasonable site investigation, which was performed by Conner’s president, Donald Conner, and its subcontractor, Phe-nix. However, despite the site investigation, Conner claims that most of the ceilings were of a locked-in-plaee concealed spline design, and the space above the ceiling was inaccessible at the time of the site investigations. Conner claims that it was able to look into some access doors, but the conditions that are at the heart of this dispute could not be seen from this limited access. Conner claims that it did not observe any conditions that led it to believe that there was any significant work to be performed above and beyond that specifically shown in the contract drawings and specifications. Because of the inaccessibility of the work area, Conner asserts that it could not make an accurate evaluation of the scope of work that needed to be accomplished.
According to Conner, the above-ceiling conditions were dark and obscured by electrical wires, making it hazardous to view the work conditions. When asked whether the conditions that he observed had given him pause for concern about reconnections having to be made in that type of space, Mr. Connor responded:
A. No.
Q. Why not?
A. I didn’t see duct. I saw wire. I saw piping.
*670 Q. Did you take the opportunity to inspect the ducts and grilles?
A. I don’t recall doing that.
Def.’s Supp.App. at 194, p. 78.
Similarly, Phenix, too, claims that it was unable to access above the ceilings to see the existing conditions before beginning work. More specifically, it maintains that during the bidding period, “all the construction areas were occupied, and above-ceiling access for inspection was very limited.” Def.’s App. at 105. At his deposition, Mr. Charles Turner, the owner of Phenix, stated that despite the presence of access panels in the ceilings, his project superintendent was unable to view the area above the ceiling because “all the pipes and duct just completely fill those, that void area between, above the ceiling.” Def.’s SuppApp. at 166, p. 44. Consequently, Phenix originally maintained that it was required to rely on its “previous knowledge” of the conditions above the Hospital ceiling, which Phenix states led it to believe that the hook-up of diffusers and grilles would be only a minor effort involving a small flexible duct connection.[7] Def.’s App. at 105. Subsequently, however, when Mr. Turner asserted that the presence of a maze of pipes and ducts blocking the view of the space above the ceiling did not, for purposes of bid preparation, give him any reason for concern, Mr. Turner offered an entirely different rationale:
Q. Did you give Mr. Ashmore, or do you give your superintendents any general instructions or are they supposed to follow any company procedure or manual when they perform a site visit?
A. I told them to go out because I wanted to see how the grilles were connected.
Q. And so that was a concern of yours? A. Correct.
Q. And what did he report back to you?
A. He reported that the ceiling was so full of pipes and other things that he couldn’t see up there.
Q. Well, didn’t that give you reason for concern, as far as whether you should submit a bid?
A. Not particularly, no.
Q. Why not?
A. I figured the A & E had already solved those problems.
Q. When you said that they had solved the problems, why did you think the A & E had solved those problems?
A. They gave us directions on the plan how to do the work, and since we couldn’t get up to see it, we followed those directions.
Q. When you say they gave you directions, what directions are you recollecting right now that they gave you on how to perform the work?
A. I recollect that they said to remove the grille and registers and connect back to the existing duct with a collar.
Q. So in your mind, you thought it was an exact take-it-off, put-it-on type project?
A. Correct.
Def.’s Supp.App. at 161-62, pp. 25-26.
Contrary to the presumptions and suppositions made by Mr. Turner, when Phenix began to remove the existing diffusers and grilles, it found that those units were not connected to the main duct system by flexible connectors, but rather each diffuser and grille was hard-piped to the main duct. In further variance from Mr. Turner’s assumptions, the project was not “an exact take-it-off, put-it-on type project” since the plans and specifications called for changes in location for placement of the diffusers and grilles in the new ceiling. Mr. Turner has acknowledged that he was unaware of these contract requirements when formulating Phenix’s bid estimate but would have been aware of them had he reviewed all of the pertinent plans and specifications.[8] Thus, in this instance, *671 both the subcontractor and the prime responsible for the work at issue here failed to adequately examine the worksite to see first hand the conditions which would dictate the nature and amount of work involved in fulfilling the requirements of the contract. Phe-nix’s explanation for its failure was that there was no harm in such an omission since it was entitled to rely upon the plans and specifications. However, like Connor, Phenix neglected to read and take into account all of the relevant plans and specifications. And, of major significance is the fact that despite their professed inability to see past a jumble of wires or pipes and ducts, both Conner and Phenix failed to inquire with Corps personnel concerning the above-ceiling conditions prior to bid submission.
Under the site investigation clause, Conner is charged with the knowledge available at the pre-bid site inspection. “It is well settled that a contractor is charged with knowledge of the conditions that a prebid site visit would have revealed.” H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1346 (Fed.Cir.1998) (citing Hardwick Bros. Co., II v. United States, 36 Fed.Cl. 347, 406 (1996), aff'd, 168 F.3d 1322 (Fed.Cir.1998)). A contractor who fails to perform an adequate site investigation bears the risk of any condition that it could have discovered if the investigation had been reasonable. See Al Johnson Constr. Co. v. United States, 854 F.2d 467, 470 (Fed.Cir.1988) (a reasonable contractor can be presumed to have examined the plans and specifications and investigated the site). In Hardwick Bros., this court found that, in the case of a project to build a levee system, data provided by the Corps revealed the possibility of a very high water table. 36 Fed.Cl. at 408. The Court of Federal Claims concluded that the plaintiff was put on notice of the possibility that conditions at the construction site would be consistently wet and that a reasonable investigation would have confirmed this. Id. The court found that although plaintiff conducted a site visit, it erred when it did not take time to review field notes and the overall wet conditions of the work area which would have given “sufficient notice to reasonably prudent bidders of poor subsurface conditions, including the possibility of high water tables and soft soils” and which would have “warn[ed] Hardwick of the operational problems it encountered.” Id. at 400. Furthermore, the Hardwick court noted that where the information about the site is obviously not current, a reasonable contractor would consider verifying the information rather than assuming that the site conditions remained consistent with that data. This court found that Hardwick did not act as a reasonable and prudent contractor in its reliance on the documents. Id. at 408.
A contractor is held accountable to discover and pursue indications which would put a reasonable and prudent contractor on notice of conditions different than those indicated in contract drawings. Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 238 (1987), aff'd, 861 F.2d 728 (Fed. Cir.1988) (unpublished) (in the case of dredging project). In Ivy H. Smith Co. v. United States, 154 Ct.Cl. 74, 79-80, 1961 WL 8713 (1961), the Court of Claims found no basis in plaintiffs allegation that defendant did not sufficiently apprise plaintiff of information possessed by defendant with respect to plaintiffs plan to use wellpoints for dewatering a construction site. In that case, the contract specifications did not mention wellpoints as a particular method for dewatering. Id. at 81. However, the court found that plaintiff was under a duty to investigate the conditions at the construction site. Id. “The plain fact is that the plaintiff placed its trust on its subcontractor____ [I]n the circumstances disclosed here, we do not think the defendant withheld any information that was not accessible to the plaintiff.” Id. at 82. In McCormick Construction, 18 Cl.Ct. at 265, this court found that plaintiffs subcontractor should have been on notice of difficult drill conditions based on site investigations. Id. “[I]t was far from astute in relying on its erroneous interpretation of the logs. This is not the proficiency one would expect from *672 the reasonable and prudent subcontractor.” Id. In Vann v. United States, 190 Ct.Cl. 546, 420 F.2d 968, 982 (1970), the Court of Claims noted that:
It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract.
Id. But see D & L Constr. Co. v. United States, 185 Ct.Cl. 736, 402 F.2d 990, 994 (1968) (holding that it was not incumbent upon contractor to seek clarification of contract drawings and specifications with respect to grading and drainage work since inconsistencies contained therein were not so gross and patent as to constitute adequate warning to plaintiff that it was obliged to seek clarification, but finding no inconsistencies regarding plastering and painting work, since contract specifically stated that in the case of differences between the drawings and specifications, the specifications would govern).
In S.T.G. Constr. Co. v. United States, 157 Ct.Cl. 409, 1962 WL 9272 (1962), plaintiff conducted two site inspections prior to bidding on a project for constructing a wharf. The visual inspection of the site showed that the surface above the low-water mark was composed of predominantly sand and gravel. After being awarded the bid, plaintiffs subcontractor began dredging and found that only the initial three to four feet of subsurface was comprised of sand and gravel and that beneath that layer was hard clay, rock and stones of various sizes. In order to complete the job, additional equipment was needed. Plaintiff then made a written complaint concerning the subsurface condition, explaining that it was materially affecting the dredging operation and causing considerable additional costs for which it proposed to be reimbursed under the changed conditions clause of the contract. Id. at 413. The contracting officer issued a decision rejecting plaintiffs claim for an equitable adjustment. Plaintiff then appealed to the Court of Claims, arguing that, having fully complied with the pre-bid inspection requirements of the contract and only observing sand and gravel, and having actually encountered hard clay, rock and stones, that plaintiff came within the terms of the changed conditions clause of the contract. Id. at 414. Defendant countered that because the physical conditions at the site were not mentioned in the contract, the subsurface condition which was encountered at the site could not differ materially from those indicated in the contract. Id. The Court of Claims agreed with defendant. Because the contract did not refer to the subsoil condition, the clause was simply inapplicable. Id. Furthermore, the S.T.G. Construction court found that plaintiff had various methods of ascertaining the subsurface conditions, and thus, it could not say that the subsurface condition was unknown or could not have been ascertained by an adequate inspection at the site. Id. at 415. “The contractor visited two locations on the western shore of the lake and found the material to be sand. But, again, further inquiry would have informed the contractor that the western shore had been built up by sand deposits .... ” Id. at 416. Thus, the Court of Claims concluded that plaintiff would have known that the substrata material consisted of sand, stone and boulders had it adequately inspected the site.
In Gevyn Constr. Corp. v. United States, 1979 WL 16487, *26 (Ct.Cl. Mar.16, 1979), the government alleged that plaintiff failed to make an adequate site inspection and therefore, was estopped from asserting a changed conditions claim. Specifically, defendant claimed that because plaintiff did not look at certain site photographs available for review, and which would have alerted the contractor as to the true condition of the existing building to be rehabilitated, plaintiff could not assert that the conditions encountered were other than what was portrayed. The contract in Gevyn contained a site investigation clause similar to the site investigation clause at issue here. The Court of Claims first noted that the interpretation of the site investigation clause, as well as of the drawings and specifications against which actual conditions are to be compared, is a question of law for determination by the court. Id. (citations omitted). The Court of Claims then found that plaintiff had indeed conducted an ade *673 quate inspection of the site and that plaintiff’s failure to review photographs did not render its pre-bid inspection inadequate or unreasonable under those clauses. Id. In particular, the president of Gevyn visited the work site prior to submitting a bid. Id. at *27. There was no way of knowing by the investigation, however, that the underlying frame of the building might have been out of alignment. Id. Plaintiff had conducted a thorough investigation of the building, “going over the building inside and out,” with his estimator, and yet, nothing in the specifications or drawings indicated that the available photographs would tell a prospective bidder anything that would contradict a visual inspection of the budding. Id. at *28.
The Gevyn court went on to discuss that the site investigation clause at issue there referred expressly to “information reasonably ascertainable from an inspection of the site.” Id. The court found that plaintiffs president made an extensive visual inspection prior to bid. Id. Furthermore, the court noted that if certain photographs were as important to a proper interpretation of the drawings as the government claimed, they should have been made a part of the contract documents upon which prospective bidders were asked to rely. Id. Accordingly, under these circumstances, the contractor’s failure to review the photographs prior to bidding did not render plaintiffs investigation unreasonable or inadequate.
The same cannot be said, however, in the case at bar. Unlike in Gevyn, where the contractor made a thorough inspection of the premises, it would be wrong to hold the government responsible for Conner’s inability to recognize the extent of the work to be done under the contract, when, despite a stated inability to inspect the work site, the contractor bid on the project, without raising any pre-bid concerns or questions to the Corps. Bidders were given authorization to inspect the work site as necessary, including inspecting the above-ceiling areas. It is undisputed that bidders were free to inspect the above-ceiling areas by use of the access panels located throughout the Hospital. Conner never sought clarification from the Corps regarding its inability to see above-ceiling conditions prior to submitting its bid. Instead, Conner relied on its subcontractor, Phenix, which not only also failed to raise the issue of inaccessibility of the above-ceiling conditions, but also neglected to review the two sets of contract drawings that indicated the new locations for the diffusers and grilles which would have increased Phenix’s pre-bid estimate of the diffuser and grille reconnection work costs.
The contract incorporated two sets of drawings, the first of which indicated the existing ceiling plan prior to demolition, and a second set of drawings that showed bidders the planned ceiling. These drawings informed the bidders that the new diffusers and grilles would be located in new positions in the ceiling and that the contractor would be responsible for reconnecting the new diffusers and grilles to the existing HVAC system. The court agrees with defendant that a review of these drawings should have placed a reasonable contractor on notice that the new diffusers and grilles were to be placed in different locations than the replaced diffusers and grilles and, that therefore, they could not be simply reconnected in the same exact locations as they had been in the replaced ceilings. This is especially true in light of the fact that the contract documents did not specify the manner of re-installing the new or existing diffusers and grilles and these same documents did not indicate what the existing conditions were above the ceiling. Conner’s interpretation of the contract documents was that new diffusers and grilles were intended to have the same air flow as the old diffusers and grilles. Contract Drawing M-8, Details and Schedules — Mechanical, listed the neck sizes at the interface between the existing ductwork and the diffusers and grilles. Conner mistakenly believed that the schedule of neck sizes would be compatible with the existing ductwork since it erroneously assumed the change in diffusers and grilles was intended to be only cosmetic or there would have been a change in air flow shown in the design. However, as with the case of the above-ceiling conditions, Conner and Phenix should have verified this point before submitting the bid. Conner did not fulfill its duty to inquire until after bid award and complications were encountered.
*674 It is this court’s opinion that, where the contract’s site investigation clause requires all bidders to perform a site inspection and where plaintiff alleges it was precluded from the reasonable conduct of such inspection by physical obstructions, plaintiff was faced with an obvious inconsistency, discrepancy or omission of significance, such as would have required plaintiff to bring the situation to the government’s attention before bid submission if it intended to subsequently resolve the issue in its own favor. See Space Corp. v. United States, 200 Ct.Cl. 1, 470 F.2d 536, 538 (1972) (citations omitted). Significant policy considerations underpin this rule. Requiring contractors to bring to the government’s attention major discrepancies or inconsistencies allows for clarification of ambiguities or correction of problems before a contract is awarded and thereby avoids the need for expensive and complex litigation during contract administration. See Beacon Constr. Co. v. United States, 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963). The preaward clarification requirement bolsters the competitive bidding system. See Monarch Painting Corp. v. United States, 16 Cl.Ct. 280, 287 (1989). The duty to inquire prevents one contractor from exploiting ambiguities in the contract so as to bid on only a portion of the work solicited and thereby appear to be the low bidder. Id. Requiring disclosure of ambiguous provisions or constructions of the contract before bidding ensures that all contractors bid on the basis of identical specifications. Id. (citing Beacon Construction., 314 F.2d at 504).
Conner and Phenix should have raised the issue of their inability to see the above-ceiling conditions during their site inspections prior to plaintiff’s bid submission. Plaintiff and its subcontractor were obliged to have taken into account: (1) the absence of any bid document detailing the existing conditions above-ceiling; (2) the inaccessibility of a clear view of those site conditions; and finally (3) the site investigation requirements set forth in the bid documents. These three factors, in conjunction, should have served to put both the contractor and its subcontractor on notice that each obviously lacked sufficient information to formulate a comprehensive bid. Clearly, a potential bidder needed to know the above-ceiling conditions in order to formulate its bid. Where bid documents fail to supply this information, but instead, require a site inspection, an inability to perform that site inspection (through no fault of the bidder) creates a glaring inconsistency. Conner was therefore obliged to have made further inquiry with the Corps to bring this contradictory and ambiguous situation to the attention of government officials who would have then been put on notice that plaintiff lacked information necessary to formulate its bid with respect to site conditions affecting the amount of work and materials necessary to comply with contract requirements.
This duty to inquire into a patent ambiguity, such as the one present in this case, “was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact.” See Community Heating, 987 F.2d at 1580 (citing Newsom, 676 F.2d at 649). It would be contrary to both the letter and intent of the law if the court were to hold the Corps responsible for the additional work claimed by Conner when plaintiff waited until after the contract was awarded to voice its concerns over the fact that it could not examine the site conditions which created additional costs.
In SIPCO Services, this court found that the absence of specific language regarding how inaccessible areas were to be treated raised a patent ambiguity because it would have been obvious to the reasonably prudent contractor that the system specified would not successfully deal with the inaccessible areas. 41 Fed.Cl. at 216. “Thus, SIPCO’s duty of inquiry was triggered.” Id. The SIPCO Services court found that SIPCO had fulfilled its duty to inquire because at the pre-bid conference, it specifically asked about the inaccessible areas and was told that the issue of the inaccessible areas would be handled later. “At that point, the burden shifted to the drafter of the specifications ... to remedy this patent defect in its bid docu- *675 mente. This patent defect, however, whether through negligence or oversight, was not corrected.” Id. The circumstances in the case at bar, however, are diametrically opposed to those present in SIPCO inasmuch as Conner failed in the first instance to lodge any inquiry with the government.
E. Conner’s Obligation under the Contract
Under the terms of the contract, Conner had an unambiguous duty to reconnect the diffusers and grilles to the existing HVAC system at specified locations which were depicted in the contract drawings. The government notes that “the sole dispute here is whether Conner was required by its contract to reconnect the newly installed D & Gs to the HVAC system at locations that were different than the location of the replaced D & Gs, making the D & Gs an operational component of the HVAC system. This dispute simply requires the [c]ourt to interpret the terms of the contract.” Def.’s Opp. to Pl.’s Mot. for Summ. J. at 3 (citing BristolrMyers, 48 Fed.Cl. at 355).
Plaintiff argues that in merely requiring existing diffusers and grilles to be removed and replaced, the contract did not require “the demolition and removal of the existing ductwork ... or the design, fabrication and installation of new ductwork associated with the diffusers and grilles.” Compl. 1115. Conner argues that because the contract specifies no particular method for reconnecting the diffusers and grilles to the existing HVAC system, Phenix was required to perform work which was separate and apart from the contract’s requirement that the new diffusers and grilles be reconnected to the HVAC system. According to plaintiff, its work in demolishing and modifying the duct-work above-ceiling during performance compelled Phenix to incur additional expenses above the contract price, entitling Conner to an equitable adjustment under the CDA.
Conner, however, ignores the plain language of the contract, which specifically requires the successful bidder to “reinstall new diffusers and grilles” in plaster ceilings. Although the contract is silent as to how exactly this was to be accomplished, it is clear that the successful bidder was required to reconnect the new diffusers and grilles to the existing HVAC system in order to make the system operable after the old diffusers and grilles were removed. This was the clear intent and purpose of the contract. The Federal Circuit, in that regard, has held that in resolving disputes which involve contract interpretation, courts must begin with an examination of the plain language of the contract. M.A. Mortenson, 363 F.3d at 1206. In M.A Mortenson, the court goes on to state that “[w]e must construe the contract to ‘effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.’ ” Id. ‘ (citing Hercules Inc. v. United States, 292 F.3d 1378, 1381 (Fed.Cir.2002)). The Federal Circuit has further held that business contracts must be construed with business sense, “ ‘as they naturally would be understood by intelligent men of affairs.’” Giove v. Dep’t of Transp., 230 F.3d 1333, 1341 (Fed.Cir.2000) (citations omitted).
In R.B. Wright Constr. Co. v. United States, 919 F.2d 1569 (Fed.Cir.1990), the Federal Circuit found that a painting contract at issue there unambiguously required that each wall, whether previously painted or not, required three coats of paint. Id. at 1571. The Federal Circuit came to this conclusion because prior case law held that the term “surface” in a painting schedule did not exclude previously painted surfaces, unless specifically stated. Id. at 1572. Plaintiff’s subcontractor ignored the three-coat requirement, relying on its own judgment in providing the number of requisite coats. Id. When formulating its bid, the contractor ignored the requirement in the painting schedule for three coats and instead erroneously assumed that the contract required only the application of as many coats for previously-painted surfaces as the subcontractor deemed necessary. Id. “[I]n such circumstances the contractor is not entitled to an increase in contract price.” Id. The contractor argued that some of the requirements of the contract were wasteful and did not conform with customary practice. Id. However, the Federal Circuit noted that “[n]either a contractor’s belief nor contrary customary practice, however, can make an unambiguous contract pro *676 vision ambiguous, or justify a departure from its terms.” Id. (citing Northwestern Indus. Piping, Inc. v. United States, 199 Ct.Cl. 540, 467 F.2d 1308, 1314 (1972)). Agreeing with the board of contract appeals, the Federal Circuit found that “[t]he government is entitled to receive what it has contracted for .... [T]hey were bound to perform the contract in accordance with its clear requirements.” Id. at 1573.
In the case at bar, the intent of the contract was to replace the old diffusers and grilles and connect the new diffusers and grilles to the HVAC system at specified locations. In other words, the government ultimately was to have an operational HVAC system. The operable contract language highlights this fact. Amendment 0002 requires the successful bidder to:
Supply air diffusers and return air grilles in all 1' X 1' and 2' X 4' ceiling grids are to be removed and replaced with new diffusers and grilles. Remove and provide new diffusers and grilles in plaster ceilings where work is being performed above ceilings. See mechanical plate M-8 for schedule. Remove and reinstall diffusers and grilles in 2' X 2' ceiling grids where work is being performed above ceilings. Balance new air terminals.
Def.’s App. at 5. The contract clearly and unambiguously indicates that the old diffusers and grilles were to be replaced with new ones and that they were to be reconnected to the HVAC system.
The disclaimer in the omissions clause lends further support to the government’s position. The omissions clause specifically states that “[ojmissions from the drawings or specifications or the misdescription of details or work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work, but shall be performed as if fully and correctly set forth and described in the drawings and specifications.” FAR 252.236-7001(d). The clause cautions bidders that information contained in the contract documents may not accurately depict encountered conditions. See Mega Constr. Co. v. United States, 29 Fed.Cl. 396, 450 (1993) (citing P.J. Maffei, 732 F.2d at 917 n. 7) (holding that where a contract contains language cautioning bidders that the information contained in the contract documents may not accurately depict conditions, if the contractor relies on the information, it does so at its own risk). This clause further supports defendant’s argument that Conner was responsible for removing the old diffusers and grilles and connecting the new ones in order to effectuate an operable system, in that any omission in the depiction of the work to be done in the contract was a risk borne by Conner.
F. Plaintiffs Changed Condition Argument
Lastly, contrary to plaintiffs argument otherwise, the contract’s changes clause is simply inapplicable. The changes clause is invoked when the contracting officer decides to expand the limits of work. Thermocor, 35 Fed.Cl. at 492. In this instance, the court finds that the contracting officer never expanded the scope of the work under the contract. Conner’s task under the contract remained the same throughout the course of the work — that was, to remove the old diffusers and grilles and to install new ones, connecting them to the existing HVAC system. The changes clause was not triggered because the contracting officer never modified the contract “by written order” for the additional work. FAR 52.243-4. At best, the parties merely entered into oral discussions in February and March of 1997 to negotiate a price for claimed changed work, but a final modification was never issued by the contracting officer. Conner entered into negotiations with Corps officials, but the evidence does not indicate that the contracting officer ever issued a written order for any asserted increase in cost. Without a written order (or in this ease, even an oral order) having been issued for a contract modification by the contracting officer, the changes clause is inapplicable. Under the changes clause, the burden is on the contractor to obtain written approval for any changes from the contracting officer in a timely fashion and in writing. See Gen. Bronze Corp. v. United States, 168 *677 Ct.Cl. 176, 338 F.2d 117, 123-25 (1964); Woodcraft Corp. v. United States, 146 Ct.Cl. 101, 173 F.Supp. 613, 614 (1959). FAR 52.253-4(a) explicitly premises an equitable adjustment on the contracting officer’s written order for a change in the work within the general scope of the contract. See Elastom-eric Roofing Assocs., Inc. v. United States, 26 Cl.Ct. 1106, 1117 (1992). Without such written modification, mere preliminary negotiations do not invoke the changes clause.
Furthermore, no constructive change can be found under the facts herein. “A constructive change generally arises where the Government, without more, expressly or impliedly orders the contractor to perform work that is not specified in the contract documents.” Lathan Co. v. United States, 20 Cl.Ct. 122, 128 (1990) (citing Chris Berg, Inc. v. United States, 197 Ct.Cl. 503, 455 F.2d 1037, 1050 (1972)); see also Aydin Corp. v. Widnall, 61 F.3d 1571, 1577 (Fed. Cir.1995) (‘Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change.”). The constructive change doctrine provides recovery for contractors under the following premise: “the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue.” Miller Elevator Co. v. United States, 30 Fed.Cl. 662, 678 (1994) (citing Am. Line Builders, Inc. v. United States, 26 Cl.Ct. 1155, 1176 (1992)), dismissed, 36 F.3d 1111 (Fed.Cir.1994) (table).
There are two basic components to the constructive change doctrine — the change component and the order/fault component. Id. at 678 (citing Al Johnson Constr. Co. v. United States, 20 Cl.Ct. 184, 204 (1990)). “The ‘change’ component describes work outside of the scope of the contract, while the ‘order/fault’ component describes the reason that the contractor performed the work.” Id. (citing Embassy Moving & Storage Co. v. United States, 191 Ct.Cl. 537, 424 F.2d 602, 607 (1970); Eggers & Higgins & Edwin A Keeble Assocs., Inc. v. United States, 185 Ct.Cl. 765, 403 F.2d 225, 236 (1968)). A constructive change issue arises for work “if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused the contractor to incur additional work----” Id. A government officer with the requisite authority must have directed the contractor to perform the additional work. Calfon Constr., Inc. v. United States, 18 Cl.Ct. 426, 434 (1989) (citing Len Co. & Assocs. v. United States, 181 Ct.Cl. 29, 385 F.2d 438, 443 (1967)), aff'd, 923 F.2d 872 (Fed.Cir.1990) (table). The work must not have been volunteered. Calfon Constr., Inc. v. United States, 17 Cl.Ct. 171, 177 (1989) (citing Singer Co., Librascope Div. v. United States, 215 Ct.Cl. 281, 568 F.2d 695, 701 (1977)).
To recover under the changes clause of the contract, based on a constructive change for work beyond that required by the contract, it must be clear that:
[E]ach of the other elements of the standard “Changes” or “Extras” clause has been present — the contracting officer has the contractual authority unilaterally to alter the contractor’s duties under the agreement; the contractor’s performance requirements are enlarged; and the additional work is not volunteered but results from a direction of the Government’s officer.
Len Co., 385 F.2d at 443.
In this instance, the contracting officer, the person with authority to modify the contract based on a change in the work, did not order the additional work to be done. Of even greater importance is the fact that, as previously discussed in detail, the disputed work performed by Conner was not “additional” work, but rather was work required under the contract. See discussion, supra. Accordingly, the court cannot find in favor of an equitable adjustment based on the changes clause, and the court must grant defendant’s motion for summary judgment on this issue.
G. Plaintiffs Differing Site Conditions Claim
The parties stipulate that the contract incorporated by reference the differing site conditions clause, as found in FAR 52.236-2(a). This clause provides that when a con *678 tractor encounters site conditions that differ from those anticipated by a contract:
(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
FAR 52.236-2(a).
Plaintiff argues that the contract affirmatively indicated site conditions that were materially different from unforeseeable conditions actually encountered, and that Conner acted reasonably in interpreting and relying on the contract documents. Plaintiff claims that the conditions encountered were unforeseeable conditions that led to the excess costs accrued in the demolition of the old ductwork and in the design, fabrication and installation of the new ductwork associated with the diffusers and grilles involved in this dispute. Therefore, the conditions above-ceiling constituted a differing site condition for which Conner claims it should be compensated.
Prior to addressing the substantive issue as to whether there existed a differing site condition entitling plaintiff to an equitable adjustment, the court must first address whether plaintiff may raise a differing site condition claim given that it failed to plead such claim in its complaint. Plaintiff asserts a claim for differing site conditions in its Response to Defendant’s Motion for Summary Judgment and Cross-Motion for Summary Judgment. Defendant argues that plaintiff failed to plead differing site conditions as a claim in the complaint, and therefore should be precluded from asserting it in plaintiffs cross-motion for summary judgment.
Although plaintiff should have sought to amend its complaint under RCFC 15(a), the court finds that plaintiffs allegations, as pled in the complaint, put defendant on sufficient notice of a potential differing site conditions claim. See, e.g., Intern’l Fid. Ins. Co. v. United States, 27 Fed.Cl. 107, 110 (Fed.Cl. 1992) (stating that “plaintiff could have been on notice that the defendant intended to raise a setoff claim” since plaintiff pleaded the issue of setoff in its complaint). For example, plaintiff claimed that “there was not sufficient room between the horizontal run of the existing ductwork and the specified location for the new ceiling to permit the use of the existing ducts without a design modification.” Compl. ¶ 30. Furthermore, defendant was not unduly burdened or substantially prejudiced by the introduction of plaintiffs differing site conditions claim. See, e.g., St. Paul Fire and Marine Ins. Co. v. United States, 24 Cl.Ct. 518, 520 (1991) (citing Effingham County Board of Educ. v. United States, 9 Cl.Ct. 177, 180 (1985); State of Alaska v. United States, 15 Cl.Ct. 276, 279-80 (1988)). But see Crest A Apartments Ltd. v. United States, 52 Fed.Cl. 607, 613 (2002) (finding that the government would be prejudiced if it allowed Crest to pursue claims not stated in its complaint but instead raised in its motion for summary judgment). Defendant had ample opportunity to, and in fact, did address plaintiffs differing site conditions claim in its response to plaintiffs cross-motion for summary judgment. Finally, the facts upon which plaintiffs differing site conditions claim is premised arise out of the same operative facts as plaintiffs other causes of action.
Despite having the opportunity to raise its claim, the court finds that plaintiff has not substantively established the elements for asserting a cause of action for differing site conditions. The purpose of the differing site conditions clause is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur. See H.B. Mac, 153 F.3d at 1343 (citing Foster Constr. C.A. & Williams Bros. Co. v. United States, 193 Ct.Cl. 587, 435 F.2d 873, 887 (1970)). Differing site conditions can arise under two circumstances: (1) the conditions encountered differ from those indicated in the contract (Type I), or (2) the conditions encountered differ from those normally encountered (Type II). Id. In the present case, although the bid documents contained no description of and made *679 no representations with respect to the above-ceiling conditions that a contractor should expect to encounter on this job, Conner, nonetheless asserts that it encountered a Type I (as opposed to a Type II) differing site condition. The court will therefore address that assertion.
In Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed.Cir.1987), the Federal Circuit explained the four elements that a contractor must prove in order to establish entitlement to an equitable adjustment by reason of a Type I differing site condition:
To prevail on a claim for differing site conditions, the contractor must prove, by a preponderance of the evidence, “that the conditions ‘indicated’ in the contract differ materially from those it encounters during performance.” P.J. Maffei, 732 F.2d at 916 (citing Arundel Corp. v. United States, [207 Ct.Cl. 84,] 515 F.2d 1116, 1128 (Ct.C1.1975)). The conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding. United Contractors v. United States, [177 Ct.Cl. 151,] 368 F.2d 585, 594 (Ct.C1.1966). The contractor also must show that it reasonably relied upon its interpretation of the contract and contract-related documents and that it was damaged as a result of the material variation between the expected and the encountered conditions. Sanders Constr. Co. v. United States, [220 Ct.Cl. 639,] 618 F.2d 121 (Ct.Cl.1979).
Id. “A material discrepancy between what is indicated in the contract documents and what is encountered at the site can result in unanticipated costs to the contractor, for which the government would be liable.” Sergent Mech. Sys., Inc. v. United States, 34 Fed.Cl. 505, 518 (1995). However, conditions which are discoverable by a reasonable site visit and review of the contract documents would be chargeable to the contractor. See id.
A contractor cannot be eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be through reasonably plain or positive indications. See P.J. Maffei, 732 F.2d at 916. Determining whether a contract contained indications of a particular site condition “is a matter of contract interpretation and thus presents a question of law.” Id. A contractor is not eligible for an equitable adjustment of a Type I differing site condition unless the contract indicated what the condition would be. See id. “The contractor will only be eligible for an award if the contract describes what conditions are to be expected, and only if the conditions at the work site were reasonably unforeseeable based upon the information available to the contractor when bidding.” Frur-Con Constr. Corp. v. United States, 43 Fed.Cl. 306, 318 (1999). The court must view itself as a reasonable and prudent contractor and decide whether the site condition was reasonably unforeseeable at the time of the bidding, in light of all then available knowledge. Stuyvesant Dredging Co. v. United States, 11 Cl.Ct. 853, 858 (1987), aff'd, 834 F.2d at 1576. “Where the contract contains no affirmative (positive or negative) representations of the ... conditions, purportedly relied on by the contractor, the government has no liability.” Weeks Dredging, 13 Cl.Ct. at 219. “In such a case, the substance of the plaintiffs averment is more akin to a miscalculation, i.e., the assumption of a perceived fact which proved erroneous.” Id. “While unfortunate, nevertheless, it is a risk for which only the contractor must assume responsibility.” Id. “In substance, ‘there must be reasonably plain or positive indications in the bid information or contract documents’ of the facts plaintiff relies on in making its differing site condition claim.” Id. (citing Pac. Alaska Contractors, Inc. v. United States, 193 Ct.Cl. 850, 436 F.2d 461, 469 (1971)). A contractor will not be awarded an equitable adjustment for a differing site condition claim unless the contract indicated just what the conditions were that one might expect. See P.J. Maffei, 732 F.2d at 916 (citing S.T.G. Constr. Co. v. United States, 157 Ct.Cl. 409, 414 (1970)); see also Ragonese v. United States, 128 Ct.Cl. 156, 120 F.Supp. 768, 769 (1954) (holding that plaintiffs were not entitled to an equitable adjustment under the changed conditions clause, because where the contract is silent *680 as to subsurface conditions, it “cannot be said that the contractor encountered subsurface or latent conditions materially different from those specifically shown on the drawings or indicated in the specifications”).
As defendant correctly notes, there were no affirmative representations made by the Corps in the bid documents which described the above-ceiling conditions at the Hospital. Plaintiff has pointed to no specification or provision in the bid documents which it contends sets forth any such representations. In fact, in letters written to plaintiff’s president, Connor’s subcontractor, Phenix, observed:
The contract documents do not specify the manner of reinstallation of the new or existing diffusers and grilles, nor the manner of connecting these units to the existing duct system. There are no details to indicate what the existing conditions were above the ceiling, and we were unable to get above the ceilings to see the existing conditions before beginning work.
Def.’s App. at 90.
Phenix’s letters went on to state that “the condition of the ceiling ... was not even mentioned by the A/E in the plans or specifications, nor realized by us during our site visit during bids----” Id. at 91. In view of the fact that the disputed contract did not reflect what conditions a prospective contractor should anticipate encountering in this case, Conner cannot demonstrate that it was damaged as a result of a material variation between above-ceiling conditions indicated in the contract and those it actually encountered. Therefore, plaintiff has failed to establish one of the required elements necessary to prove a Type I differing site condition. See H.B. Mac, 153 F.3d at 1345.
Additionally, the court finds that the conditions ultimately encountered were reasonably foreseeable. For a Type I claim, “the underlying issue ... is whether the contractor reasonably could have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, its inspection of the site, and its general experience as a contractor.” John Massman Constr. Co. v. United States, 23 Cl.Ct. 24, 31 (1991) (citing Erickson-Shaver Contracting Corp. v. United States, 9 Cl.Ct. 302, 304 (1985)). Inasmuch as the bid documents contained no representations with respect to the above-ceiling conditions which prospective contractors were expected to encounter, foreseeability must be determined by Connor’s pre-bid site inspection and plaintiff’s general experience as a contractor. The court has already determined that plaintiff failed in its obligation to perform a reasonable site inspection or, in the alternative, to notify the government that it was being prevented from performing such site inspection. Both Con-nor and Phenix were experienced government contractors and while this court will not venture to opine that Phenix’s prior construction work at the Hospital should have put it on notice with respect to the above-ceiling conditions, at the very least, experienced government contractors should have been aware of their obligation to conduct a site investigation where the bid documents so require and of their duty to inquire in the event that circumstances precluded the site inspection. A reasonable site inspection would have revealed the above-ceiling conditions. Furthermore, to the extent that those portions of the workspace above the ceiling available for viewing could not be inspected because of the presence of a maze of pipes and ducts obscuring the view, that fact alone should have alerted a reasonable, experienced contractor both of the need to inquire with the government as well as the likelihood that there might well be a space problem with the void area above the ceiling.
In sum, the court finds it clear that plaintiffs differing site conditions claim is based not on any clear contract indications, but upon plaintiff’s factual assumptions. Furthermore, the court finds that the site conditions of which plaintiff complains were foreseeable. The court grants defendant’s motion for summary judgment with respect to plaintiffs differing site conditions claim.
H. Plaintiffs Defective Drawings Claim
Conner argues that the contract’s plans and specifications were defective because the contract drawings did not inform the bidders *681 of the extensive demolition work that would be required to connect the new diffusers and grilles to the HVAC system. Allegedly, the Corps’ deficient drawings compelled Conner to incur additional expenses above the contract price because the new ductwork above-ceiling was placed in different locations than the existing D & Gs.
Defendant argues that Conner’s interpretation of the contract — that it was not required to demolish or remove and modify the existing ductwork in order to reconnect the new diffusers and grilles to the HVAC system — renders the requirement that new diffusers and grilles be installed meaningless. Defendant contends that the contract unambiguously required the successful bidder to reconnect the diffusers and grilles to the HVAC system. Defendant further alleges that an evaluation of the contract drawings confirms that those drawings were not defective. “Rather, the drawings informed bidders that the new D & Gs had to be placed in different locations in the ceiling than where the replaced D & Gs, which were scheduled for demolition, had previously been located.” Def.’s Opp. to Pl.’s Mot. for Summ. J. at 5-6 (citing Def.’s App. at 196-280). The government argues that had Conner reviewed the terms of the contract and the drawings prior to submitting its bid, the additional costs incurred in connecting the new diffusers and grilles would have been foreseeable.
In Robins Maint., Inc. v. United States, 265 F.3d 1254, 1257 (Fed.Cir.2001), the Federal Circuit explained that where a contractor seeks an equitable adjustment based on a theory of defective specifications, there can be no recovery unless the contractor was actually misled by the erroneous statements in the specifications. Furthermore, the Federal Circuit has stated that “[t]here can be no recovery if there was no reliance____[and] [reasonable reliance cannot exist where the contractor bid without having reviewed the contract documents on which it seeks to rely.” Comtrol, Inc. v. United States, 294 F.3d 1357, 1364 (Fed.Cir. 2002). The Federal Circuit recently summed up the above-stated premise in E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1338 (Fed.Cir.2004). Whenever the government uses specifications in a contract, there is an accompanying implied warranty that those specifications are free from errors. Id. (citation omitted). In order to recover an equitable adjustment based upon an erroneous specification, a contractor must show that it was misled by the error in the specifications. Id. A claimant is not entitled to recover when it was aware of a defect in the specification at the time of entering the contract. Id. at 1339 (citations omitted). Furthermore, when a contractor is faced with an obvious omission, inconsistency or discrepancy of significance, he is obligated to bring the situation to the government’s attention if he intends subsequently to resolve the issue in his own favor. Id. (citations omitted).
In Comtrol, the Federal Circuit found that because Comtrol had failed to review a report incorporated into the contract, it had failed to review all of the contract documents concerning subsurface conditions, and therefore, it could not show that it reasonably relied on the report’s description of soil and water conditions. 294 F.3d at 1364; see also Youngdale & Sons Constr. Co. v. United States, 27 Fed.Cl. 516, 535 (1993) (finding it unreasonable not to inspect soil tests referenced in the contract). The Federal Circuit also found in Comtrol that Comtrol could not maintain a claim for defective specifications based on the placement of the pipeline at issue there in the utility corridor. See id. Comtrol claimed that the pipelines were not disclosed in the contract and that the solicitation specifically stated that “[n]o pipes ..., except those indicated, will be encountered.” 294 F.3d at 1365. The pipeline drawing, however, depicted the proposed location for the new utility corridor as running beneath a portion of the site. The Federal Circuit held that although the pipeline drawing did not state when the pipeline would be relocated, “it did put Comtrol on notice that a jet fuel pipeline recently existed and that its relocation was anticipated.” Id. The Federal Circuit, agreeing with this court, found that a reasonable contractor would have inquired about the location and condition of the pipeline. Id. The Federal Circuit specifically noted that the documents did not indicate when the pipeline would be *682 relocated, or whether the old or new pipelines would be encountered by the contractor. Id. “Nonetheless, we hold that Comtrol cannot recover because any ambiguity in the documents was patent.” Id. “A contractor has a duty to seek clarification of a patent ambiguity.” Id. (citing Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1375 (Fed.Cir.2002); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 998 (Fed.Cir.1996)). The Federal Circuit thus concluded that:
It is undisputed that Comtrol failed to inquire about the relocation of the ... pipeline or the actual location of the utility corridor before bidding. We agree with the Court of Federal Claims that the Pipeline Drawing and the other contract drawings placed Comtrol on notice that a fuel pipeline might exist at or near the construction site, and that Comtrol had a duty to seek clarification of this ambiguity. Therefore, Comtrol cannot establish a differing site conditions claim or defective specifications claim relating to the pipeline because it cannot establish that it acted as a reasonably prudent contractor in interpreting the contract documents.

Id.

In this instance the contract incorporated two sets of drawings — one set of demolition drawings indicating the existing ceiling plan prior to demolition and a second set of drawings that informed bidders of the planned ceiling. The drawings informed bidders that the new diffusers and grilles would be located in new positions in the ceiling and that the successful contractor would be responsible for reconnecting those diffusers and grilles to the existing HVAC system. Defendant argues that based upon a reasonable review of these drawings, bidders should have known that the new diffusers and grilles would be placed in different locations and that they could not simply reconnect the new diffusers and grilles to the HVAC system' in the same exact locations as the diffusers and grilles had been in the replaced ceiling.
During his deposition, the president of Phenix, Charles Turner, testified that the mechanical work for Conner’s bid was based upon the mistaken assumption that the new diffusers and grilles would be placed in exactly the same location as the replaced diffusers and grilles. Mr. Turner further acknowledged that he neglected to review the two sets of contract drawings that indicated the new locations for the diffusers and grilles prior to the submission of Conner’s bid, and that he was alarmed by the crowded nature of the above-ceiling conditions when Phenix inspected the site.[9] Def.’s Supp.App. at 171, pp. 62-63. Despite his concerns, Mr. Turner acknowledged that Conner decided to submit its lump-sum bid to the Corps without seeking further clarification regarding the installation.
Mr. Turner acknowledged that had he inspected the two aforementioned drawings prior to estimating the mechanical work, he would have known that the new diffusers and grilles had to be placed in different locations in the ceiling than the replaced diffusers and grilles. Id. at 171, pp. 62-63; 172-73, pp. 69-70. Mr. Turner further confirmed that Conner and Phenix understood that they were responsible for making the newly installed diffusers and grilles operational, but had submitted their bid to the Corps under the mistaken assumption that the new diffusers and grilles would simply be placed in the same, exact location as the replaced diffusers and grilles. Id. at 169-73.
Similarly, Conner’s president, Donald Conner stated in deposition testimony that he too failed to compare two drawings showing the locations of the old diffusers and grilles and the new diffusers and grilles at the time of the bid. Id at 192, p. 73. Although he testified that he reviewed some mechanical notes regarding the diffusers and grilles, and that from this, his understanding was that the successful bidder would have to remove the diffusers and grilles, replace them, and reconnect the new ones, id. at 186, pp. 46-47, he did not review the two drawings that would have shown where the new connections could have been made. Id. at 192, pp. 72-73. In light of the fact that neither plaintiff nor *683 plaintiffs subcontractor reviewed the documents upon which Conner’s defective drawings claim is premised, plaintiffs assertion of defective specifications is fatally flawed. Comtrol, 294 F.3d at 1364. Without Phenix and Conner having reviewed the contract drawings, plaintiff cannot maintain a cause of action for defective drawings and specifications.
As a further impediment to plaintiffs argument, the court notes that simply because the contract documents did not specify exactly how Conner was to make an operational system, that fact does not render the contract drawings and specifications defective. An omission regarding the methodology of the reconnection of the diffusers and grilles to the ductwork does not invite a claim of defective drawings, as plaintiff would like the court to decree. The general rule with regard to the government’s liability for defective specifications is that, if the specifications are strictly observed, the government implicitly warrants that satisfactory performance will result. See Universal Contracting and Brick Pointing Co. v. United States, 19 Cl.Ct. 785, 793 (1990) (citations omitted). A claim based on defective specifications can only be maintained if the contract incorporates design rather than performance specifications. Haehn Mgmt. Co. v. United States, 15 Cl.Ct. 50, 56 (1988) (citations omitted), aff'd, 878 F.2d 1445 (Fed.Cir.1989) (table). The government’s liability only arises if the court finds the specifications to be of the design type, rather than the performance type. Universal Contracting, 19 Cl.Ct. at 793. The difference between design and performance specifications has been described by this court:
Performance type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance____ Design specifications are explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed and no deviation therefrom is possible.
Utility Contractors, Inc. v. United States, 8 Cl.Ct. 42, 49 (1985), aff'd, 790 F.2d 90 (Fed. Cir.1986) (table). Design specifications set forth in precise detail the materials to be employed and the manner in which the work ... [is] to be performed.” J.L. Simmons Co. v. United States, 188 Ct.Cl. 684, 412 F.2d 1360, 1362 (1969). By contrast, performance specifications “set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.” Id.
As was the case in Universal Contracting, 19 Cl.Ct. at 793, contracts may contain both elements of design and performance. See Fru-Con, 42 Fed.Cl. at 96. In order to differentiate between the two, a court looks to the level of discretion inhering within a given specification; “discretion serves as the touchstone for assessing the extent of implied warranty and intended liability.” Id. (citing Blake Constr. Co. v. United States, 987 F.2d 743, 746 (Fed.Cir.1993)). A contractor, in addition to showing that the subject specifications do not permit meaningful discretion, must also show that the defective specifications are the cause of injury. Id. For example, detailed measurements, tolerances, materials, and elaborate instructions as to how to perform the contract are of a design nature. See Haehn Management, 15 Cl.Ct. at 57. On the other hand, operational characteristics and specifications that leave the details of how to comply with the contract up to the contractor are of a performance nature. Id. (citing Stuyvesant Dredging, 11 Cl.Ct. at 860).
In this instance, the aspect of the contract involving the replacement of diffusers and grilles clearly reflects performance specifications and Conner has failed to demonstrate that it lacked discretion in performing the contract in order to warrant a finding of defective specifications. The contract drawings showed the layout of the ductwork and the sites of the old diffusers and grilles and where the new diffusers and grilles were to be placed along with a requirement that the system was to be made operable. This lack of detail indicates a performance specification because the contract drawings were *684 silent as to how the new diffusers and grilles were to be re-attached to the HVAC system. The successful bidder in this ease was given a significant amount of discretion in making the system operational. Conner was expected to use its own judgment and experience in deciding how to successfully perform the contract requirements. See Universal Contracting, 19 Cl.Ct. at 794. Both Conner and Phenix acknowledged in deposition testimony that while the contract ultimately did not specify how the diffusers and grilles were to be connected, the contract required that there be an operable HVAC system employing the new D & Gs. Under these circumstances, the lack of description as to the manner of the reconnection does not render the contract drawings defective. This merely afforded Conner discretion in performing the contract. In light of the foregoing, plaintiff cannot maintain its cause of action for defective drawings and defendant’s motion for summary judgment is granted as to this claim.
I. Plaintiff’s Impossibility Claim
Conner asserts a claim for impossibility of performance, contending that it was impossible for Conner to complete the work as contracted. In support of this argument, Conner asserts that the original specified work could not be performed since the specifications and drawings initially required only cosmetic changes with the existing airflow unchanged. “The extensive alterations to the duct[]work changed the airflow, and Conner ... could only complete the work with changes to the duct[]work that were approved by the Army. It was impossible for Conner ... to complete the work as provided for in the Construction Contract Specifications and Drawings without a design modification.” Pl.’s Resp. to Def.’s Mot. to Dismiss at 32.
Pursuant to the doctrine of impossibility, a contractor’s performance may be excused when a condition that is part of the contract becomes impossible to perform. Natus Corp. v. United States, 178 Ct.Cl. 1, 371 F.2d 450, 456 (1967); see also Oak Adec, Inc. v. United States, 24 Cl.Ct. 502, 506 (1991). “[C]ontract performance is rendered impossible only when it is objectively determined that no contractor could perform the work.” Seaboard Lumber Co. v. United States, 41 Fed.Cl. 401, 417 (1998) (citing Oak Adec, 24 Cl.Ct. at 508; Natus Corp., 371 F.2d at 456), aff'd, 308 F.3d 1283 (Fed.Cir.2002). In Seaboard, this court explained that the reason for this rule is to place the burden of performance upon the party who originally accepted that burden. “This not only preserves the integrity of freedom of contract, but it also serves economic efficiency by the most rational allocation of risk and performance resources.” Id.
Based on a reading of the allegations, as pled, and in light of the fact that Conner did, in fact, perform the contract, it appears that Conner’s impossibility claim is actually a claim for commercial impracticability.[10] In essence, Conner is arguing that the contract was commercially impracticable to perform because of the added costs to remove and demolish existing ductwork. A contract is commercially impracticable when performance would cause “ ‘extreme and unreasonable difficulty, expense, injury, or loss to one of the parties.’ ” Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed.Cir.2002) (citing Restatement (Second) of Contracts § 261 cmt. d (1981)). “A finding of impracticability excuses a party from performing unless the party has assumed the risk of the event.” Id. “In government contracting, impracticability has also been treated as a type of constructive change to the contract; because a commercially impracticable contract imposes substantial unforeseen costs on the contractor, the contractor is entitled to an equitable adjustment.” Id.
A contract is said to be commercially impracticable when, “because of unforeseen events, ‘it can be performed only at an exces *685 sive and unreasonable cost,’ ” id. (citing Int'l Elecs. Corp. v. United States, 227 Ct.Cl. 208, 646 F.2d 496, 510 (1981)), or when “‘all means of performance are commercially senseless.’ ” Id. (citing Jennie-O Foods, Inc. v. United States, 217 Ct.Cl. 314, 580 F.2d 400, 409 (1978)). Whether performance of a particular contract would be commercially senseless is a question of fact. Id.
Conner acknowledges that it was able to ultimately perform the reconnection work. “After Conner ... began demolition of the locked-in-place concealed spline ceilings, Conner ... and Phenix observed that there was not so sufficient room between the horizontal run of the existing ductwork and the specified location for the new ceiling to permit the use of the existing ducts without design modifications.” Pl.’s Prop. Findings of Fact ¶ 138. “As a result of such problems, instead of joining the new diffusers and grilles to the existing ductwork ... it was generally necessary to remove the existing duct and reroute it around local interferences.” Id. If 140. Once Conner reported the above-ceiling conditions to the Army in a February 11, 1997 meeting, Phenix suggested a way to modify the design, together with an itemized unit price proposal. The Army and Conner came to an agreement as to a solution to the problem and Conner furnished the Army with a proposal and budget for the additional work. Much of the duct-work was completed by the time the claim was filed.
These facts do not establish a claim for commercial impracticability. Although the reconnection work may have been more expensive for Conner, the cost overrun was not so significantly disparate so as to warrant a finding of impracticability. See Raytheon, 305 F.3d at 1368 (stating that a 57% cost overrun does not, by itself, establish commercial impracticability) (citing Gulf & W. Indus., Inc., 87-2 B.C.A. (CCH) ¶ 19,881, at 100,575, 1987 WL 40946 (1987) (a 70% overrun was not commercially impracticable)). In this instance, Conner is seeking $245,954 as additional compensation for the overrun, which is a 3.3% increase from Conner’s bid of $7,270,637. This clearly does not constitute commercial impracticability. Accordingly, defendant’s motion for summary judgment is granted with respect to plaintiffs claim for impossibility.
J. Plaintiffs Superior Knowledge Claim
Plaintiff alleges that the Army had superi- or knowledge with respect to the site problem in that, among other things, the Army instructed Conner’s architect not to perform an above-ceiling inspection and failed to disclose this fact to Conner so that it could either account for this risk in its bid or choose not to bid the work at all. “Here, the Army had superior knowledge that, among other things, the Army had ‘instructed’ the architect not to perform an above-ceiling inspection and failed to disclose this to Conner ... so that it could either account for this risk in its bid or chose not to bid on the work at all.” Pl.’s Resp. to Def.’s Mot. to Dismiss at 31.
Defendant counters that Conner cannot maintain a superior knowledge claim because Phenix had prior knowledge of the above-ceiling conditions in the Hospital. “Its general experience, combined with its subcontractor’s particular knowledge of the hospital facilities, provided Conner the basis upon which it should have anticipated the ‘difficulties’ it eventually encountered in performance.” Def.’s Mot. for Summ. J. at 18. Defendant contends that:
Rather than making an adequate site investigation and requesting further clarification from the Corps regarding the placement of the new D & Gs, Conner proceeded upon the mistaken assumption that the conditions above-ceiling would merely require “minor effort involving a small flexible duct,” Def.’s App. at 90-92, to reconnect the new D & Gs. As a matter of law, because the work encountered in reconnecting the D & Gs was readily foreseeable to Conner from a reasonable site inspection and/or from a reasonable review of the contract drawings, Conner cannot establish that ... it was misled regarding the work required.
Def.’s Opp. to Pl.’s Mot. for Summ. J. at 15.
It is well established that when the government possesses material informa *686 tion which would affect a contractor’s performance and fails to disclose that information, even though the government has no reason to believe that the contractor could obtain it from another source, such non-disclosure may constitute a breach of contract. See GAF Corp. v. United States, 932 F.2d 947, 949 (Fed.Cir.1991); Am. Ship Bldg. Co. v. United States, 228 Ct.Cl. 220, 654 F.2d 75, 79 (1981). Under the implied duty of good faith and fair dealing, the government maintains an implied duty to disclose information fundamental to the preparation of estimates or contract performance. Miller Elevator Co., 30 Fed.Cl. at 674. “Superior knowledge is ‘knowledge which is vital to performance of the contract but which is unknown and is not reasonably available to bidders who are thereby misled.’ ” McCormick Construction, 18 Cl.Ct. at 265 (citing Utility Contractors, 8 Cl.Ct. at 52). “It is well settled in this court that where the [government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the government has an affirmative duty to disclose such knowledge.” Hardeman-Monier-Hutcherson v. United States, 198 Ct.Cl. 472, 458 F.2d 1364, 1371-72 (1972). If the government fails in this duty, the government breaches the contract. Pia v. United States, 7 Cl.Ct. 208, 211 (1985), aff'd, 818 F.2d 876 (Fed.Cir.1987) (table).
There are four requirements for establishing when the government has failed in its duty to disclose superior knowledge. First, the contractor undertakes to perform without vital knowledge of a fact that affects performance costs or direction. Second, the government was aware that the contractor had no knowledge of and had no reason to obtain such information. Third, the contract specification supplied either misled the contractor, or did not put it on notice to inquire. Fourth, the government failed to provide the relevant information. See Giesler v. United States, 232 F.3d 864, 876 (Fed.Cir.2000) (citing Hercules, Inc. v. United States, 24 F.3d 188, 196 (Fed.Cir.1994)); see also Lopez v. A.C. & S., Inc., 858 F.2d 712, 717 (Fed.Cir. 1988); Petrochem Sens., Inc. v. United States, 837 F.2d 1076, 1079 (Fed.Cir.1988); American Ship Building, 654 F.2d at 80; McCormick Construction, 18 Cl.Ct. at 265.
Additionally, a bare withholding of information is not enough to make a case for superior knowledge. See Leal v. United States, 149 Ct.Cl. 451, 276 F.2d 378, 383 (1960). A contractor does not have an action for breach of contract unless it can prove that the alleged withholding of information, in fact, misled the contractor. See Ragonese, 120 F.Supp. at 770-71. If plaintiff knew or should have known that it would encounter the challenged condition, it cannot be said that plaintiff was misled. Id. at 771. In McCormick Construction, McCormick claimed that the government’s alleged withholding of electric logs, which it contended was vital information, constituted suppression of superior knowledge. 18 Cl.Ct. at 266. McCormick’s subcontractor complained that it had insufficient information for preparation of the bid; however, it prepared the bid nonetheless. McCormick suggested that additional relevant and vital data was not provided to the subcontractor, as mandated by the contract, and therefore, a breach had occurred. However, the McCormick Construction court found that the information claimed to have been withheld was not “vital.” Id. The reports at issue “would provide them with nothing more than the knowledge that they already had or knowledge only discernable by a geophysical expert.” Id. “[T]he ... drilling logs, together with site visit, should have cautioned a reasonably prudent driller that drilling conditions would be less than ideal.” Id. “ ‘[A]ny misleading that occurred was due to plaintiffs own unreasonable assumptions.’ ” Id. (citing Mojave Enters. v. United States, 3 Cl.Ct. 353, 358 (1983)).
In Sergent Mechanical, there was clear evidence that the government withheld vital and material information about various site restrictions in the work area up until the day before work was to begin. 34 Fed.Cl. at 519. The Sergent Mechanical court found no excuse for the government’s failure to disclose the potential restrictions at the work site in a timely manner. “[P]laintiff has based its arguments not so much on what the affirmative indications of the documents were, but more on the fact that the documents omitted era- *687 cial information which affected the contractor’s performance.” Id. “The primary omission was the Air Force’s failure to give the contractor timely notice of the restrictions it would impose,” which prevented Sergent Mechanical from pursuing its original plan for excavation. Id.
Conversely, in this instance, there was no glaring withholding of information by the government as was the case in Sergent Mechanical. With respect to the first and second prongs of the superior knowledge test, at best, Conner and the government had the same knowledge of the above-ceiling conditions, but the government did not have superior knowledge. As plaintiff has asserted throughout its submissions to the court, there were no details in the contract documents that suggested how the new diffusers and grilles were to be attached or installed. Both parties were made aware of a site investigation conducted by Southeastern Architects Engineers Planners, Inc. (hereinafter A/E), which was hired by Stevens and Wilkinson of Georgia, Inc.[11] to investigate the site and existing conditions, and to prepare drawings showing the location and size of the main ductwork and other systems requiring modification. Pl.’s Findings of Fact ¶¶ 20-21. According to plaintiff, the Army modified the A/E drawings with handwritten notes regarding the space in the ceilings and the ductwork, see id. ¶¶ 23-24, but A/E did not conduct an in-depth investigation of the conditions above-ceiling when it should have. Id. ¶ 35. Charles Turner, on behalf of Phenix, stated that he assumed that A/E had solved the problems regarding the inability to see and access ductwork pre-bid, stating that “[A/E] gave us directions on the plan how to do the work, and since we couldn’t get up to see it, we followed those directions.” Def.’s Supp.App. at 162, p. 26. It is clear from the evidence presented that Conner and its subcontractor Phenix were made privy to the same information about the above-ceiling conditions as the government. There is nothing in the materials presented that indicates that the government possessed additional knowledge that was not shared with Conner.
Furthermore, despite whatever knowledge the Corps may have possessed, Conner, as explained in Section II.D, supra, was on notice to inquire as to the above-ceiling conditions. Prospective bidders on the project were urged to make a site visit to investigate the conditions of the existing hospital that would affect the work required to be performed. The site visit clause stated that “offerors and quoters are urged and expected to inspect the site where work will be performed.” FAR 52.236-27. Similarly, the site investigation clause required Conner to acknowledge that it took “steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost____” FAR 52.236-3. Conner was also required to acknowledge “that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site____” Id. There is no indication that the government withheld facts from Conner given that both Conner and Phenix had every opportunity to inspect the premises and review the contract documents for themselves. Conner did not seek clarification from the Corps with respect to the above-ceiling conditions prior to submitting the bid. Without utilizing the available means to discern the actual conditions within which the work was to be performed, the court finds that plaintiff was not misled by the government. Rather, plaintiff simply exercised misjudgment on its part when it relied on its own and its subcontractor’s less-than-thorough review of the contract materials and did not inquire with the Corps about the above-ceiling conditions.
As previously stated, Conner engaged in three site visits prior to submitting its bid. Conner’s president stated in deposition testimony that he was able to view parts of the area above the ceiling via some access panels, *688 but he was unable to do so in other areas. It is clear that Conner was never denied access by the government in conducting a pre-bid site visit. Instead, Conner never discussed any potential concern about being unable to see the above-ceiling workspace with anyone at the Corps until after a bid was submitted, the contract was awarded, and work had commenced. Conner was provided with contract drawings and specifications by the Corps. With respect to the second prong required to establish superior knowledge (that the contractor neither knows or should have known of the facts), Conner, by virtue of the fact that it could have discovered the conditions above-ceiling had it made further inquiries with the Corps, has not demonstrated in what way the government withheld knowledge from it that it could not have learned itself.
K. Plaintiffs Mistake Claim
Plaintiff claims that there exists either a unilateral or mutual mistake as to the degree of effort required in removing and replacing the air system diffusers and grilles. In particular, Conner claims that the Corps “failed to call to its attention a potential mistake in its bid related to the diffuser/grille work.” Compl. If 68. Defendant asserts that Conner has failed to identify any mistake in Conner’s bid.
Parties to a contract are generally bound by its terms. See Giesler, 232 F.3d at 869. In limited circumstances, if the government has actual or constructive knowledge that a contractor’s bid is based upon a mistake, and the government accepts the bid and awards the contract despite knowledge of this mistake, then the court may reform or rescind the contract. Id. (citing United States v. Hamilton, 711 F.2d 1038, 1046 (Fed.Cir.1983); Ruggiero v. United States, 190 Ct.Cl. 327, 420 F.2d 709, 713 (1970)). Such relief may be appropriate to prevent the government from overreaching when it knows the contractor has made a significant mistake during the bidding process. Id. (citing Ruggiero, 420 F.2d at 713).
In the case of mutual mistakes, courts have resorted to reformation to conform the words of a contract to those the parties actually intended. Bromley Contracting Co. v. United States, 219 Ct.Cl. 517, 596 F.2d 448, 454 (1979) (citations omitted). The purpose of reformation is to make a defective writing conform to antecedent expressions on which the parties agreed. Id. (citation omitted). “The remedy has been extended from its traditional area of application — mutual mistake by the parties — to include cases where the Government knew or should have known of a mistake in a bid costly to the bidder.” Burnett Elecs. Lab, Inc. v. United States, 202 Ct.Cl. 463, 479 F.2d 1329, 1333 (1973). With respect to unilateral mistakes, the equitable remedy of reformation to correct a unilateral mistake in a plaintiffs bid is available only if “the government knew or should have known of a mistake in a bid costly to the bidder.” Id. (citations omitted); see also Wender Presses, Inc. v. United States, 170 Ct.Cl. 483, 343 F.2d 961, 962 (1965) (A mistake in a bid claim may be pursued “only if defendant’s responsible official knew or should have known of the mistake at the time the bid was accepted”).
Generally, if the government suspects that a mistake in the contractor’s bid has been made, it will request a verification of the bid under the federal procurement regulations. Carrier Corp. v. United States, 6 Cl.Ct. 169, 173-74 (1984). A request for verification of a bid must be legally adequate, including the reasons for the contracting officer’s suspicion that the bid may contain a mistake. Id. at 173 (citations omitted). If the government’s request for verification is inadequate, it is without legal effect, and a plaintiff may seek reformation of the contract as though the verification request was never made. Id. (citations omitted). There is no overreaching by the government and a contract will not be reformed in cases where the government requests and receives adequate verification of the bid price from the bidder before the contract is awarded. Ala. Shirt & Trouser Co. v. United States, 121 Ct.Cl. 313, 330-31, 1952 WL 5924 (1952). In “mistake in bid” cases, the mistake must be a clear-cut clerical or arithmetical error, or a misreading of specifications. Nat’l Line Co. v. United States, 221 Ct.Cl. 673, 607 F.2d 978, 984 (1979). If the contractor’s error does not *689 constitute one of these kinds of mistakes, then the contractor is not eligible for reformation of the contract. Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed.Cir.1987). The error does not extend to mistakes of judgment. Ruggiero, 420 F.2d at 713. In Aydin Corp. v. United States, 229 Ct.Cl. 309, 669 F.2d 681, 685 (1982), the Court of Claims found that plaintiffs mistake in its estimate was nothing more than plaintiff underestimating the cost of materials, and hence, its bid. In that case, plaintiff did not show that its estimate was a clear cut clerical or arithmetical error, nor was there a claim of misreading specifications. Id.
Where a mistake in bid is not alleged until after the contract is awarded, such as in this case, plaintiff may recover only if defendant’s responsible officials knew or should have known of the mistake at the time the bid was accepted. Wender Presses, 343 F.2d at 962. In Aydin, plaintiff contended that an almost 40% disparity between two bids that came before the contracting officer placed the contracting officer on constructive notice of the error in the bid estimate, and that acceptance of the bid without verification did not result in an enforceable contract. 669 F.2d at 686. Furthermore, the contractor in Ay-din argued that because work had already been performed and accepted by the government, plaintiff was entitled to restitution.
The Aydin court noted that the test for constructive notice in cases dealing with mistaken bids is whether under all the facts and circumstances of the case “ ‘there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer.’ ” Id. (citing Chernick v. United States, 178 Ct.Cl. 498, 372 F.2d 492, 496 (1967)). The mere disparity between bids does not automatically lead to the conclusion that the test for constructive notice has been satisfied. Wender Presses, 343 F.2d at 963. “The test here ... must be that of reasonableness, whether under the facts and circumstances of the particular case there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer.” Id. As such, where circumstances exist at the time of bid evaluation which offer reasonable explanations for the disparity between bids, the Wender Presses test of reasonableness is satisfied. Aydin, 669 F.2d at 687. The Ay-din court concluded that the disparity in bids did not lend to a finding of constructive notice of a mistake. Id.
In this instance, the government did not request verification of Conner’s bid since plaintiff first raised the mistake in bid issue after the contract had been awarded and work had commenced. Accordingly, the court must inquire as to whether Conner “misread” the specification when it submitted its bid since there is no allegation that Conner committed a clerical or arithmetical error when it submitted its bid. Giesler, 232 F.3d at 869. In Giesler, the Federal Circuit found that the contractor there failed to read the at-issue specification, and that it manifested an error in business judgment as a result. Id. at 870-71. This, the Federal Circuit held, amounted to “gross negligence” on the part of the contractor, thus precluding equitable relief. Id. In the case at bar, because this court has already found that there was no error in the contract drawings or specifications and that plaintiff failed in its duty to inquire, plaintiff cannot maintain a mistake-in-bid claim based upon a misreading of specifications. See discussion supra Section II.D.
Conner has also failed to offer evidence that the government knew or should have known of the purported mistake. It is true that the government has a general duty to examine bids for mistakes. Giesler, 232 F.3d at 872 (citing 48 C.F.R. § 14.407-1). Here, however, there was no indication of a mistake in plaintiffs bid that would have raised the government’s suspicion of a mistake in bidding. In this instance, in response to the amended solicitation, the contracting officer reviewed three lump-sum bids. None of these bids specified separate estimates for the proposed mechanical work. Conner’s bid was 90.3% of the Corps’ estimate and Conner’s bid was relatively close to the other bidders. Conner’s bid of $7,270,637 was in fine with the two other bids submitted for $8,290,500 and $9,070,297. See Allied Contractors, Inc. v. United States, 159 Ct.Cl. 548, 310 F.2d 945, 946 (1962) (holding that a contracting officer was not on constructive *690 notice of an error in low bid because difference between the award of the low bid and the government estimate was not significant); Bromley Contracting, 596 F.2d at 449 (holding that government was under no duty to verify a bid where bid was 39% lower than the next lowest bid and 12% lower than the government estimate).
Nothing in Conner’s bid materials gave rise to a suspicion of a mistake in its bid. Conner did not adequately inquire as to the above-ceiling conditions and did not avail itself of the full information available to it. Conner’s mistake-in-bid claim must be rejected as a mistake in its own business judgment. Liebherr Crane, 810 F.2d at 1157; Sanders-Midwest, Inc. v. United States, 15 Cl.Ct. 345, 352-53 (1988) (plaintiff exercised a mistake in its own business judgment when it did not ascertain beforehand whether contract work would be subject to state sales tax). Accordingly, defendant’s motion for summary judgment on plaintiffs mistake claim is granted.
L. Plaintiff’s Estoppel Claim
Plaintiff claims that the government should be estopped from withdrawing its approval of the changed work since it would be unfair to permit the government to enforce its rights after Conner relied upon the government’s approval to conduct the additional ductwork. Allegedly, because the Army previously agreed that the ductwork was additional, extra work, Conner claims that it should be estopped from now asserting that the original work to be done was not changed.
It is unclear from plaintiffs allegations whether Conner is asserting a claim for promissory estoppel or equitable estoppel. Promissory estoppel involves a “promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee.” LaMirage, Inc. v. United States, 44 Fed.Cl. 192, 200 (1999) (citation omitted), affd, 232 F.3d 912 (Fed.Cir.2000). It is well settled that the Court of Federal Claims is without jurisdiction to entertain a promissory estoppel claim and this court lacks authority to entertain a plaintiffs cause of action on the basis of promissory estoppel. Id. (citations omitted); see also Durant v. United States, 16 Cl.Ct. 447, 450 (1988) (citing Biagioli v. United States, 2 Cl.Ct. 304, 308 (1983)). This court does not possess jurisdiction to entertain a claim arising from a contract based upon a theory of promissory estoppel or upon a contract implied-in-law. LaMirage, 44 Fed.Cl. at 200; see also Ra-dioptics, Inc. v. United States, 223 Ct.Cl. 594, 621 F.2d 1113, 1129 (1980) (expressing reservation as to whether a claim based on promissory estoppel is within this court’s jurisdiction under the Tucker Act).
Equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute. La-Mirage, 44 Fed.Cl. at 200. The doctrine of equitable estoppel is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled. Id. (citing Heckler v. Cmty. Health Servs. of Crawford County, Inc., 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). Although the United States Supreme Court in Heckler did not come to a final conclusion as to whether equitable estoppel could be raised against the United States, the Supreme Court suggested that there could be limited circumstances in which equitable estoppel is applicable against the sovereign. 467 U.S. at 60, 104 S.Ct. 2218. When a plaintiff claims equitable estoppel against the government, in order to warrant judicial intervention and prevail, the party invoking the doctrine against the United States bears a heavy burden to prove the elements of estoppel. Id. at 61, 104 S.Ct. 2218. The Federal Circuit in Zacharin v. United States, 213 F.3d 1366, 1371 (Fed.Cir.2000), noted the following with respect to claims of equitable estoppel against the government:
Although the Supreme Court has not adopted a per se rule prohibiting the application of equitable estoppel against the government under any circumstances, it has made it clear that “the government may not be estopped on the same terms as any other litigant.” Heckler, 467 U.S. at 60[, 104 S.Ct. 2218]. In particular, the [Supreme] Court has suggested that if equitable estoppel is available at all against *691 the government some form of affirmative misconduct must be shown in addition to the traditional requirements of estop-pel____While the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable es-toppel against the government, [the Federal Circuit] has done so ..., as has every other court of appeals.
Id. (emphasis added); see also Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1377 (Fed.Cir.2003) (stating that it is well settled in the Federal Circuit that some form of “affirmative misconduct” must be shown in addition to the traditional requirements of estoppel when an equitable estoppel claim is asserted against the Government).
The doctrine of equitable estoppel bars a party from raising a defense or an objection it otherwise would have. Biagioli, 2 Cl.Ct. at 307 (quoting Jablon v. United States, 657 F.2d 1064, 1068 (9th Cir.1981)). The affirmative defense of equitable estoppel requires that the asserting party reasonably relied upon the conduct of the estopped party. Henry v. United States, 870 F.2d 634, 636-37 (Fed.Cir.1989). The elements of equitable estoppel are: (1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted. Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc., 971 F.2d 732, 734 (Fed.Cir.1992); see also A. C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1041 (Fed.Cir.1992) (stating that this formulation of the three elements of equitable estoppel “reflects a reasonable and fairly complete distillation from the case law”). An explicit representation is not a necessary precondition for a finding of equitable estoppel. Hercules Inc. v. United States, 49 Fed.Cl. 80, 88 (2001), aff'd, 292 F.3d at 1378. Estoppel may he for a course of conduct, without misrepresentation, by the estopped party. Id. “ ‘This latter view is in accord with those eases that hold that a party who engages in a course of conduct, even without misrepresentation, upon which another party has a right to believe he is intended to act or upon which the first party intends him to act, will be estopped from repudiating the effect of such conduct.’ ” Id. (citing Emeco Indus., Inc. v. United States, 202 Ct.Cl. 1006, 485 F.2d 652, 657 (1973)). In addition to these requisites, it is an established proposition that estoppel cannot be set up against the government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the government. See Byrne Org., Inc. v. United States, 152 Ct.Cl. 578, 287 F.2d 582, 587 (1961).
Conner’s equitable estoppel claim fails because the government person who purportedly agreed to Conner’s proposed price modification for the additional duct-work, Ken Bright, did not possess the requisite authority to bind the government. See Emeco Industries, 485 F.2d at 657 (“It is essential to a holding of estoppel against the United States that the course of conduct or representation be made by officers or agents of the United States who are acting within the scope of their authority”); Doe v. United States, 48 Fed.Cl. 495, 505 (2000) (same). Conner purportedly negotiated the diffusers and grilles reconnection cost issue with Ken Bright of the Corps. The uncontroverted evidence indicates that Mr. Bright did not possess authority to bind the government to a contractual modification in excess of $100,000. Def.’s App. at 100; Def.’s Supp. App. at 183, p. 36. Because the modification sought by Conner was for approximately $400,000, Mr. Bright would have been acting outside of the scope of his authority to approve the proposed modification. Def.’s Supp.App. at 184, p. 38. Furthermore, from the parties’ submissions to the court, the contracting officer made no representations that Conner would be compensated for the additional ductwork. The government admits that a pre-change agreement on unit prices for various types of unusual work was sought by Conner. Def.’s App. at 148. However, the government never formally agreed to any modification with regard to the extra compensation being sought by Conner. Id.; see also Def.’s Findings of Fact 1133. Conner did not enter into any enforceable *692 agreement with the Corps that it would be compensated for the additional ductwork.
Despite Conner’s urgings to the contrary, the Army clearly stated in July 1997 that there would be no modification and that Conner needed to submit its request for a contracting officer’s final decision. Although Conner believed that an “understanding” had been reached between Conner and the government that Conner would be paid extra for the modifications needed, as a result of meetings and negotiations that occurred in February and March 1997, no modification was actually issued and the proposed agreement was never reduced to a writing. At best, there was merely a verbal agreement that Conner would be paid an extra sum for making the additional connections. After Conner began demolition of the lock-in-place concealed spline ceilings, both Conner and Phe-nix observed that design modifications had to be made in order to connect the diffusers and grilles to the existing ductwork. Conner first reported these conditions to the Army on February 11, 1997. On February 14, 1997, Conner forwarded to the Army a letter written by Phenix which included a sketch and unit price proposal to undergo the work Conner insisted was necessary to complete the Contract. On February 18, 1997, the Army received this additional information from Conner and Conner’s proposal to modify the existing ductwork. On March 4, 1997, the Army advised Conner that the “connection between the new diffuser and the existing duet are considered to be part of the subject contract and a modification shall not be forthcoming for this portion of the work.” Pl.’s Findings of Fact H152 (citing PL’s App. 74 at 1110). It was at this point, less than a month after the D & G issue was first raised by Conner to the government, that the government expressed to Conner that there would be no change to the contract based on the alleged additional work. The Army stated that:
[A] pre-change agreement on unit prices for various types of unusual work was sought by the [government. However, this was for future application in the event some anticipated or unusual circumstance occurred that was not part of the contract requirements. In this case, rather than just complaining about just a few rare instances, Conner sought recovery for over 1400 instances. In other words, for almost every diffuser and grille replacement. The [gjovemment never agreed with Conner that the installation of the replacement diffusers and grills, or duct modification in the manner Conner proposed, was outside the scope the contract requirements.
Def.’s App. at 148.
Based on these circumstances, the court does not agree that Conner was misled by the government. The facts do not show that the contracting officer intentionally deceived Conner. See DeMarco Durzo Dev. Co. v. United States, 60 Fed.Cl. 632, 638 (2004). There is a presumption that public officers perform their duties correctly, fairly, and in good faith, and in accordance with the law and governing regulations. See Alaska Airlines v. Johnson, 8 F.3d 791, 795 (Fed.Cir. 1993). The mere assertion that the Corps and Conner came to a purported oral agreement that Conner would be compensated for the additional ductwork is not sufficient to overcome the presumption that the contracting officer acted in good faith, even viewing the facts most favorable to Conner. Without demonstrating affirmative misconduct by the government, and without demonstrating that representations were made by someone with appropriate contracting authority, Conner’s claim for equitable estoppel fails.
CONCLUSION
For the following reasons, it is hereby ORDERED that:
(1) Defendant’s Motion for Summary Judgment, filed September 10, 2002, is GRANTED;
(2) Plaintiffs Cross-Motion for Summary Judgment, filed October 11, 2002, is DENIED;
(3) The Clerk’s office is DIRECTED to ENTER judgment for defendant, dismissing plaintiffs complaint with prejudice; and
(4) Each party shall bear its own costs.

. The specific language of Amendment 0002 is as follows:
Remove all T X 1' and 2' X 4' ceiling tiles and replace with new 2' X 2' ceiling tiles. Remove and replace 2' X 2' ceiling tiles as necessary for sprinkler, medical gas and duct installations and/or renovation.
Supply air diffusers and return air grilles in all 1' X 1' and 2' X 4' ceiling grids are to be removed and replaced with new diffusers and grilles. Remove and provide new diffusers and grilles in plaster ceilings where work is being performed above ceilings. See mechanical plate M-8 for schedule. Remove and reinstall diffusers and grilles in 2' X 2' ceiling grids where work is being performed above ceilings. Balance new air terminals.
Def.’s App. at 5.

. The pertinent contract drawings are as follows: (1) Drawings A-8 through A-25 of the "Partial Reflected Ceiling Plans” depicting the T x T ceiling that was required to be removed and the approximate location of the old diffusers, see Def.'s App. at 29-50; (2) Drawings A-27 through A-45 of the "Partial Reflected Ceiling Plans” showing the new work requirement in the same part of the Hospital as shown on drawings A-8 through A-25, see id.; (3) Drawings X-8 and X-9, the contract "Phasing Plan,” setting forth the phasing required to complete the contract, including the requirement that the “[h]ospital will be in operation during construction,” Def.’s App. 51 at n. 2, the requirement to "[c]ap airtight half of supply air diffusers in work area, and all of return air or exhaust grilles”, Def.’s App. 52 at n. 11, the requirement to ”[r]emove individual supply diffusers and return air registers and cap duct branch connections when ceiling is removed,” id. at n. 12, and the requirement to "[¡Install new diffusers and grilles," id. at n. 13; and (4) Drawing plate M-8, "Details & Schedules — Mechanical,” sheet 77, containing a diffuser and register schedule, Def.’s App. at 53.

. See Specification section 15895, Air Supply and Distribution System for Air-Conditioning System, Part 2, Productions, para. 2.8.7.I.

. See Specification section 15895, Air Supply and Distribution System for Air-Conditioning System, Part 2, Productions, para. 2.8.1.2.

. In preparing to bid upon the mechanical subcontract for the project, Mr. Charles Turner, the owner of Phenix Mechanical Contractors, Inc. (Phenix), Conner's subcontractor, sent Mr. Clyde Ashmore, a Phenix project superintendent, to “check out the area.” Def.’s App. at 159. The extent of the superintendent’s site visit is unclear. Mr. Turner stated that Mr. Ashmore visited the work area, but could not see how the grilles were connected in the ceiling. Def.’s Supp.App. at 161, pp. 25-26; 166, pp. 45-46.

. Pursuant to court order dated December 4, 2004, the parties filed Joint Stipulations of Fact on March 15, 2005.

. The court observes that Mr. Turner’s own statements contradict this contention. Although Mr. Turner made that statement concerning his prior knowledge of the Hospital ceiling conditions in a letter to plaintiff dated November 10, 1997, four years later, during his deposition, Mr. Turner disavowed that either he or anyone in his company would have examined the space above the ceiling at the Hospital on any occasion or for any other contract prior to the contract at issue here. Def.'s Supp.App. at 161, p. 24; 167, pp. 46-47.

. Likewise, Conner's president states that he did not study the pertinent drawings so as to discern that the new grilles were in different locations than the old in the new ceiling: "At the time of *671 the bid, I did not compare the two drawings [to see where the locations were].” Def.’s Supp. App. at 192, p. 73.

. The court observes that in another statement, however, Mr. Turner asserted that the crowded nature of the above-ceiling conditions did not give him reason for concern because he "figured that A & E had already solved those problems.” Def.'s Supp.App. at 161-62, pp. 25-26.

. It is clear that neither Phenix nor Conner deemed it impossible to perform the additional ductwork necessary to complete the contract. It was simply more expensive. The demolition and redesign of the ductwork was not objectively impossible to perform, rather, the work was merely more extensive than originally planned. This does not constitute a legal impossibility requiring compensation.

. Stevens and Wilkinson was awarded a separate contract regarding the design of the Hospital life safety upgrade. Pl.’s Findings of Fact ¶ 17.